### PEOPLE v BEAVERS

Docket No. 54847. Argued May 10, 1974 (Calendar No. 16).—Decided April 7, 1975.

Edward Beavers was convicted by a jury in the St. Clair Circuit Court, Kenneth J. Stommell, J., of sale of heroin without a license. Two police officers monitored the conversation between the defendant and a police informant carrying a battery-operated radio transmitter under his shirt while the informant bought heroin from the defendant in defendant's home. Both officers testified about the conversation at trial. The Court of Appeals, Quinn, P. J., and Bronson and Van Valkenburg, JJ., affirmed (Docket No. 13215). Defendant appeals, arguing that monitoring of his conversation with the informant was an unreasonable search and seizure. *Held:*

1. An investigatory action such as the one in this case, in which communications directed to particular persons are simultaneously being intercepted by a third party (participant monitoring), constitutes a search and seizure which can be constitutionally justified only if a valid search warrant is issued, unless the prosecution can carry the burden of justification of an exception to the warrant requirement.

2. A search and seizure conducted without prior approval by an independent magistrate is per se unreasonable and its fruits are inadmissible at trial and, under the facts of this case, in which the circumstances are not unique so as to fall within any of the recognized exceptions to the warrant requirement, a search warrant should have been issued prior to instituting the participant monitoring procedure.

3. The decision in this case is to be applied prospectively.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 6, 7, 9, 11, 12–14] 68 Am Jur 2d, Searches and Seizures § 31.

[3] 68 Am Jur 2d, Searches and Seizures § 35 *et seq.*

[4] 68 Am Jur 2d, Searches and Seizures §§ 2–6.

[5] 68 Am Jur 2d, Searches and Seizures § 35.

[8] 21 Am Jur 2d, Criminal Law §§ 610, 611.

25 Am Jur 2d, Drugs, Narcotics and Poisons § 48.

[10] 16 Am Jur 2d, Constitutional Law § 81.

4. Defendant's contention that the sentence of 20 to 40 years imprisonment constitutes cruel and unusual punishment is reviewable in light of 1971 PA 196 which establishes the maximum term of imprisonment as not more than 20 years.

Reversed and remanded for a new trial.

M. S. Coleman, J., dissented on the ground that the Constitution of the United States has not been construed to prohibit such electronic monitoring, and the Court should assign proper weight to opposing interests and give some consideration to public policy before imposing controls under the state Constitution which are stricter than those required by the United States Constitution. In this case, the defendant had no justifiable expectation of privacy in carrying out his sale of heroin, and the police officers interfered with no legitimate constitutional interest.

OPINION OF THE COURT

1. SEARCHES AND SEIZURES—CONVERSATION—COMMUNICATIONS—RIGHT OF PRIVACY—CONSTITUTIONAL LAW.

The view that considers paramount the privilege of one participating in a conversation to control the extent of his communications, that one's expectation of privacy should not be subjected to the possibility that communications directed to particular persons are simultaneously being intercepted by a third party (participant monitoring), and that such investigatory action constitutes a search and seizure which can be constitutionally justified only if a valid search warrant is issued, is more consistent with the spirit of the state constitutional protection against unreasonable searches and seizures than the view that participant monitoring is a variant of the privilege of a party to repeat a conversation (Const 1963, art 1, § 11).

2. CONSTITUTIONAL LAW—SEARCHES AND SEIZURES—THIRD-PARTY MONITORING—COMMUNICATIONS.

The constitutional bounds of the doctrine which allows admission of communications directed in misplaced confidence to one who later repeats them is not to be extended to encompass the threat of warrantless third-party monitoring of conversations between an unsuspecting speaker and one who knowingly transmits the conversations to another.

3. SEARCHES AND SEIZURES—SEARCH WARRANT—RIGHT OF PRIVACY.

The search warrant requirement is not a burdensome formality designed to protect those who would engage in illegal activity,

but, rather, a procedure which guarantees a measure of privacy and personal security to *all* citizens.

4. Searches and Seizures—Without Warrant—Evidence—Constitutional Law—Fourth Amendment.

A search and seizure conducted without prior approval by an independent magistrate is per se unreasonable and, accordingly, its fruits are inadmissible at trial where the circumstances of a case are not unique so as to fall within any of the recognized exceptions of the warrant requirement and no reasons are advanced to justify departure from the mandate of the Fourth Amendment which requires strict adherence to the judicial process (US Const, Am IV).

5. Searches and Seizures—Warrant—Burden of Justification—New Trial.

In the absence of a search warrant, the burden of justification is upon those seeking an exception from the warrant requirement; therefore, a case must be remanded for a new trial where this burden has not been carried.

6. Searches and Seizures—Participant Monitoring—Without Warrant.

A search warrant should have been issued prior to instituting a participant monitoring procedure where a police officer monitored a conversation between defendant and a police informant equipped with a concealed radio transmitter which was relayed to the officer without defendant's knowledge.

7. Searches and Seizures—Without Warrant—Participant Monitoring—Evidence—Admissibility.

The admissibility of testimony of an informant as to statements spoken to him directly by a defendant in a conversation which was monitored by police officers receiving radio signals from a transmitter hidden on the informant's person is in no way affected by ruling inadmissible the testimony of the officers about the transmitted account because their information was obtained without a warrant.

8. Criminal Law—Sentence—Cruel and Unusual Punishment—Appeal and Error—Statutes.

A defendant's contention that a sentence of 20 to 40 years imprisonment for the sale of heroin constitutes cruel and unusual punishment is reviewable in the light of a subsequent statute which establishes the maximum term of imprisonment for the offense at not more than 20 years (MCLA 335.152, 335.341).

DISSENTING OPINION

M. S. COLEMAN, J.

9. SEARCHES AND SEIZURES—RIGHT OF PRIVACY—NARCOTICS—TRANS-
   MITTER.

   *A defendant was not denied freedom from an unlawful search
   and seizure and an unlawful invasion of his privacy when a
   narcotics informant wearing a concealed radio transmitter
   made a heroin purchase from him and the conversation relat-
   ing to the "buy" was electronically overheard by two police
   officers without a search warrant; there was no violation of
   either the Federal or state Constitutions (US Const, Am IV;
   Const 1963, art 1, § 11).*

10. CONSTITUTIONAL LAW—CONSTRUCTION—POLICY.

    *State constitutional provisions may on occasion be interpreted as
    affording protections beyond those required by the United
    States Supreme Court as a matter of Federal constitutional
    law, but there should be an overlay of public policy considera-
    tions in each of the more restrictive holdings.*

11. CRIMINAL LAW—PARTICIPANT MONITORING—LAW ENFORCEMENT—
    DRUGS AND NARCOTICS.

    *Participant monitoring is practiced extensively throughout the
    country and represents a vitally important investigative tool of
    law enforcement; that tool should not be taken from law
    enforcement agencies in narcotics cases, in which they have a
    uniquely difficult task because of the inherent necessity for
    privacy in drug sales and the small size of the product, result-
    ing in a business operated from within living quarters in which
    a sale may be invisible to the observer.*

12. CONSTITUTIONAL LAW—RIGHT OF PRIVACY—INFORMERS—EVIDENCE
    —ADMISSIBILITY.

    *The Fourth Amendment, as interpreted by the Federal courts,
    does not protect what a person knowingly exposes to the public,
    even in his own home or office, so that narcotics sold in a
    defendant's home to a police agent who has concealed his
    identity are not rendered inadmissible, and conversations ac-
    companying the transaction can be related at trial without
    violating the Fourth Amendment (US Const, Am IV).*

13. CONSTITUTIONAL LAW—RIGHT OF PRIVACY—INFORMERS—PARTICI-
    PANT MONITORING—INTRUSION.

    *By Federal and Michigan standards, a record from a device
    concealed on the person of a police informer who buys narcotics*

*in a defendant's home would be admissible in evidence, as
would be testimony by people listening from a closet or at an
open window or viewing the premises with binoculars, and
conversations between the informer and the defendant can be
written down or related to third parties; as a practical matter,
monitoring the same consensual conversations through a radio
transmitter carried by the informer is no greater degree of
intrusion.*

14. DRUGS AND NARCOTICS—RIGHT OF PRIVACY—CONSTITUTIONAL LAW
      —INFORMERS—PARTICIPANT MONITORING.
    *A defendant who sold heroin in his home to a police informer had
    no justifiable expectation of privacy in carrying out the sale
    and no right to traffic in narcotics free of police interference,
    and he assumed a risk that the purchaser would recall, record,
    or transmit the conversation.*

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Peter E. Deegan,*
Prosecuting Attorney, and *Peter R. George,* Chief
Appellate Attorney, for the people.

*State Appellate Defender Office* (by *Joseph B.
Szeremet),* for defendant on appeal.

J. W. FITZGERALD, J. Defendant was convicted by
a jury of the sale of heroin[1] and received a sen-
tence of from 20 to 40 years imprisonment. The
Court of Appeals affirmed the conviction and we
granted leave to appeal.

Ronny Barker, a police informant, was cooperat-
ing with the Port Huron Police Department in
their efforts to control the trafficking of narcotics.
On December 6, 1970, he was contacted by Sgt.
Joseph Eastwood and asked to participate in a
controlled purchase of narcotics from the defend-
ant. Barker and Officer Eastwood then picked up

---

[1] The statute in effect at the time of sentencing, MCLA 335.152;
MSA 18.1122, has been repealed by 1971 PA 196 and is now MCLA
335.341; MSA 18.1070(41).

Lt. Herman Dusellier and proceeded to a parking lot where Barker was thoroughly searched by the two officers. A battery-operated radio transmitter was then installed underneath his shirt. This apparatus was designed to transmit sounds from Barker's immediate vicinity to a receiver, or "walkie-talkie", which was located in Officer Eastwood's unmarked car. The transmitter attached to Barker had no receiving capabilities and could only transmit sounds originating from the vicinity occupied by Barker. Informant Barker was also provided with a supply of money with which to make the purchase.

Barker testified that he and the two officers proceeded in Sgt. Eastwood's personal vehicle to 23rd and Cleveland in Port Huron, arriving at approximately 5:55 p.m. He walked a short distance to defendant's apartment building and knocked on the rear door. Defendant's son answered and Barker asked to see "BeeBee", the name with which he identified the defendant. When the defendant approached, Barker inquired "if he had anything". Defendant responded by saying he had some "Jones", a term used to describe heroin.

When asked by defendant how much he wanted to buy, Barker indicated "a dime bag", or ten dollars worth. Defendant stated "okay" and produced two aluminum foil packets containing heroin, handing them to Barker in exchange for ten dollars. Barker returned to the car and handed the two foil packets over to Sgt. Eastwood.

Officer Dusellier testified that he accompanied Barker and Sgt. Eastwood to the vicinity of defendant's apartment. He observed Barker approach defendant's apartment and, by listening to the "walkie-talkie", was able to identify Barker's voice

along with two unidentifiable others. At no time did Lt. Dusellier see the defendant.

Officer Eastwood testified that his preliminary investigations revealed that defendant was involved in drug trafficking. He observed defendant's light blue 1964 Cadillac parked in front of his apartment approximately one hour before the purchase and prior to his rendezvous with Barker and Lt. Dusellier. Sgt. Eastwood stated, as did Barker, that he and Officer Dusellier remained in his unmarked car monitoring the conversation between Barker and defendant. He testified that he was familiar with defendant's voice and was able to identify it as such. At no time did Officer Eastwood see the defendant.

The testimony of Barker and the two investigating officers was contradicted by several defense witnesses. Lettie Myers, defendant's mother-in-law, testified that she was in the apartment of defendant the entire day and most of the evening on December 6, 1970. No one came to the door during that period. She observed defendant, his wife and son, and a man named John leave for Detroit in defendant's car about 9 a.m. and didn't see them again until their return at approximately 11:30 p.m. Adeline Beavers, defendant's wife, testified that she accompanied her husband, son, and John Salhudinn as they left their apartment at approximately 9 a.m. on the morning of December 6, 1970 with Detroit as their destination. While enroute, their car began to emit heavy smoke. Defendant left his car to be repaired at a service station in the custody of a man by the name of "Nate". She stated she had never before visited the station. She further testified that the four of them proceeded by taxi to the home of defendant's mother. Defendant and John journeyed back to the service station

soon after their arrival at his mother's home and remained there until approximately 7 o'clock that evening. Defendant and John returned to his mother's home to visit and they departed later, arriving back at defendant's apartment at approximately 12 midnight.

John Salhudinn testified that he travelled with defendant and his family to Detroit on December 6, 1970 for the purpose of visiting a Muslim temple. However, he stated, as did Adeline Beavers, that he returned to Nate's service station with defendant at approximately 11 a.m. and waited with defendant throughout the entire afternoon until the car was repaired. At approximately 7 p.m., he and the defendant returned to defendant's mother's house.

Nathaniel ("Nate") Thomson, the operator of the service station, testified that defendant's car was not functioning properly as they entered his station on the morning of December 6, 1970. He did not recall defendant leaving the station, but did state that defendant and another person remained there throughout the afternoon until the car was repaired, which was approximately 7 p.m. Witness Thomson further testified that he knew defendant for approximately 10 years and, contrary to the testimony of defendant's wife, stated that he had seen Adeline Beavers quite a few times at the service station. The testimony of Adeline Beavers was further contradicted by Thomson's statement that the car contained two young girls when first entering the station.

Robert Smith, defendant's brother-in-law, who lived in the flat below defendant's mother, testified that he first saw defendant and his wife at 7:30 on the evening of December 6, 1970 in his own apartment. He recalled defendant and his family along

with another man leaving at approximately 9:45 that evening.

Defendant was arrested six days after the alleged transaction. Following a four-day trial, the jury found defendant guilty of the sale of heroin.

It is argued that defendant was denied the right to freedom from an unreasonable search and seizure when a police officer testified, over objection, to a conversation between defendant and a police informant equipped with a concealed transmitter which was relayed to the officer without defendant's knowledge and without authorization of a search warrant. Defendant contends that the Supreme Court decision in *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), expanded the right to privacy to include freedom from the uninvited ear through instantaneous monitoring of a conversation thought to be privileged. The people argue that *United States v White,* 401 US 745; 91 S Ct 1122; 28 L Ed 2d 453 (1971), is controlling. There, the Court found no distinction between the possibility that a law enforcement agent *without* electronic equipment might subsequently reveal the contents of a conversation to others and the possibility that the same conversation is simultaneously being transmitted to a third party. In neither instance did the Court find an invasion of defendant's constitutionally justifiable expectation of privacy. Further elaboration of these opposing positions convinces us that under the facts of this case a search warrant should have been issued prior to instituting this specific participant monitoring procedure.[2]

---

[2] Where the phrase "participant monitoring" appears, we specifically refer to the use of an electronic device *by a participant* of a conversation which transmits the exchange to a third party. We do not address those situations which include a participant himself *recording* the conversation or the use of an electronic device by a

We are acutely sensitive to the fundamental interests involved when prevailing law enforcement techniques are balanced against protections guaranteed citizens under the state and Federal constitutions. With the advent of increasingly sophisticated electronic surveillance equipment, the evolving body of law which seeks to reconcile the need for effective police investigative practices in combatting criminal activity with the ominous spectre of the Orwellian Big Brother is fraught with complexities. Extensive commentary must, however, yield to a specific discussion of the issue before us. We deal here with the constitutional validity of a warrantless electronic surveillance conducted by local police officers assisted by an informant equipped with an electronic transmitter which permitted off-premises monitoring of defendant's incriminating statements uttered in his own home. No permanent recording of the conversation exists. Defendant objects to the admissibility of a police officer's corroborating testimony regarding the contents of the monitored conversation.

The Supreme Court's plurality opinion in *United States v White, supra,* involved the identical issue and set forth an exhaustive analysis of participant monitoring. The Court reinstated defendant's conviction by ruling admissible the testimony of government agents regarding an electronically transmitted account of incriminating statements made by defendant during a conversation with a police informant. Four justices disagreed. Justice White, joined by three others, perceives participant monitoring as a variant of the privilege of a party to repeat a conversation. He believes the use of elec-

*third party only* to eavesdrop upon a conversation between two parties, one of whom is cooperating with the authorities.

tronic equipment does not create a constitutional barrier which would prevent an agent from disclosing to a third party the contents of an exchange between himself and another. Conversely, Justice Harlan considers paramount the privilege of one participating in a conversation to control the extent of his communications.[3] His position is that one's expectation of privacy should not be subjected to the possibility that communications directed to particular persons are simultaneously being intercepted by a third party. He maintains that such investigatory action constitutes a search and seizure which can be constitutionally justified only if a valid search warrant is issued. We view the latter proposition as being more consistent with the spirit of the state constitutional protection against unreasonable searches and seizures.[4]

We are not prepared to rule that one's misplaced confidence in a disguised police informant who instantaneously transmits a conversation to law enforcement authorities deprives the conversation of its private character. Justice White's analysis supporting this view proceeds as follows:

(1) Law enforcement agencies have authority to utilize police informants in order to obtain incriminating physical evidence from a defendant in his own home;[5]

(2) One who communicates directly with another

---

[3] In adopting this position, Justice Harlan also expresses Justice Douglas' concern that the dangers inherent in the unrestricted use of electronic surveillance have a considerable chilling effect upon the free exchange of communication, and Justice Marshall's insistence that the safeguards of the warrant requirement must accompany investigative conduct.

[4] Const 1963, art 1, § 11: "The person, houses, papers, and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation."

[5] *Lewis v United States,* 385 US 206; 87 S Ct 424; 17 L Ed 2d 312 (1966).

assumes the risk that the exchange will be repeated to a third party;[6]

(3) Federal agents may simultaneously record or transmit their direct conversations with suspected criminals and later offer testimony regarding the exchanges into evidence;[7]

(4) If police agents, *acting alone,* can engage in lawful, warrantless investigating activity, it follows that courts should not erect barriers to the admissibility of relevant, probative evidence of wrongdoing simultaneously monitored by a third party who later testifies as to what he heard.[8]

Nevertheless, we are persuaded by the logic of Justice Harlan which recognizes a significant distinction between assuming the risk that communications directed to one party may subsequently be repeated to others and the simultaneous monitoring of a conversation by the uninvited ear of a third party functioning in cooperation with one of the participants yet unknown to the other. Participant monitoring by a third party was noticeably absent in each of the cases relied upon by Justice White. We choose not to extend the constitutional bounds of misplaced confidence to encompass the threat of warrantless third-party monitoring of conversations between an unsuspecting speaker and one who knowingly transmits the communication to another. A party speaking in private conversation with another, particularly where the conversation occurs in the speaking party's resi-

[6] *Hoffa v United States,* 385 US 293; 87 S Ct 408; 17 L Ed 2d 374 (1966).

[7] *Lopez v United States,* 373 US 427; 83 S Ct 1381; 10 L Ed 2d 462 (1963).

[8] As noted earlier, no tape recording of the conversation exists in the instant case. Nor did one exist in *White.* Justice White views *participant* recording and *third-party monitoring* as being similar in nature, both constituting reasonable investigative efforts inviolate of the Fourth Amendment.

dence, has not "knowingly expose[d] [this conversation] to the public"[9] because an unknown party may be surreptitiously hearing every word being spoken.

Participant monitoring is practiced extensively throughout the country and represents a vitally important investigative tool of law enforcement. Equally significant is the security and confidence enjoyed by our citizenry in knowing that the risk of intrusion by this type of electronic surveillance is subject to the constitutional protection against unreasonable searches and seizures. By interposing the search warrant requirement prior to engaging in participant monitoring, the risk that one's conversation is being intercepted is rightfully limited to circumstances involving a party whose conduct has provided probable cause to an independent magistrate to suspect such party's involvement in illegal activity. The warrant requirement is not a burdensome formality designed to protect those who would engage in illegal activity, but, rather, a procedure which guarantees a measure of privacy and personal security to *all* citizens. The interests of both society and the individual should not rest upon the exercise of the unerring judgment and self-restraint of law enforcement officials. Our laws must ensure that the ordinary, law-abiding citizen may continue to engage in private discourse, free to speak with the uninhibited spontaneity that is characteristic of our democratic society.

The circumstances of this case are not unique in nature so as to fall within any of the recognized exceptions[10] to the warrant requirement. No rea-

---

[9] The statement in *Katz, supra,* 351, that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection", must refer to the risk taken by the speaker that the *person with whom he communicates* may broadcast its contents to the world.

[10] No exigent circumstances existed which would result in the loss

sons are advanced to justify departure from the mandate of the Fourth Amendment which requires strict adherence to the judicial process.[11] Given this premise, a search and seizure conducted without prior approval by an independent magistrate is per se unreasonable and, accordingly, its fruits are inadmissible at trial.[12] In the absence of a warrant, the burden of justification is upon those seeking an exception from the warrant requirement.[13] This burden has not been carried and we must remand for a new trial.

This Court does not condemn the exercise of participant monitoring by law enforcement personnel. However, when circumstances justify the use of this surveillance technique, the resulting search and seizure must be conducted in full compliance with the warrant requirement to be properly admitted at trial. The admissibility of the informant's testimony is in no way affected by ruling inadmissible the testimony of the two police officers. The warrantless monitoring and subsequent testimony of these two witnesses renders tainted the *transmitted* account of the conversation, but does not in any way prevent the informant from testifying as to the statement spoken to him *directly.*

While the result reached today reflects an analysis of Federal case authority, our conclusion is

of evidence if a warrantless search were not conducted immediately. *Schmerber v California,* 384 US 757; 86 S Ct 1826; 16 L Ed 2d 908 (1966). Nor was this a search made incident to lawful arrest, *Chimel v California,* 395 US 752; 89 S Ct 2034; 23 L Ed 2d 685 (1969), or conducted while in hot pursuit, *Warden v Hayden,* 387 US 294; 87 S Ct 1642; 18 L Ed 2d 782 (1967). Obviously, the automobile and inventory search exceptions are not pertinent. As to the consensual search exception, its inapplicability is acknowledged by our analysis of this case.

[11] *United States v Jeffers,* 342 US 48; 72 S Ct 93; 96 L Ed 59 (1951).

[12] *Katz v United States, supra,* 357.

[13] *Chimel v California, supra,* 762.

based upon the Michigan Constitution and the protection afforded the people of this state against unreasonable searches and seizures. The decision today is to be applied prospectively.[14]

Resolution of the first issue renders unnecessary any discussion of additional issues raised by defendant.[15]

Reversed and remanded for a new trial.

T. G. KAVANAGH, C. J., and T. M. KAVANAGH, SWAINSON, WILLIAMS, and LEVIN, JJ., concurred with J. W. FITZGERALD, J.

M. S. COLEMAN, J. *(to affirm)*. The principal issue is whether defendant was denied freedom from an unlawful search and seizure and an unlawful invasion of his privacy when a narcotics informant wearing a transmitter made a heroin purchase from him and the conversation leading to the "buy" was electronically overheard by two police officers without a search warrant. I would hold that there has been no violation of either the Fourth Amendment or of Const 1963, art 1, § 11.[1]

---

[14] For a further discussion of the most recent study of electronic surveillance, *see Privacy in a Free Society,* Final Report of the Annual Chief Justice Earl Warren Conference on Advocacy in the United States, 1974, published by the Roscoe Pound-American Trial Lawyers Foundation.

[15] We do note, however, that defendant's contention that the sentence of 20 to 40 years imprisonment constitutes cruel and unusual punishment is reviewable in light of 1971 PA 196 which establishes the maximum term of imprisonment for not more than 20 years.

[1] US Const, Am IV

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized."

Const 1963, art 1, § 11

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without

The trial judge correctly admitted the testimony of the two police officers.

## 1.

Defendant, whose defense was alibi, was jury convicted for the sale of heroin on December 3, 1971 in St. Clair County. Ronny Barker, a police informer, was picked up at his hotel on December 6, 1970 by Joseph Eastwood of the Port Huron Police Department. The officer had seen defendant's light blue car unattended in his driveway and believed it a propitious time to make a narcotics purchase. His investigation had led him to believe that defendant was trafficking in drugs. Herman Dusellier, another police officer, joined Eastwood and Barker. Mr. Barker, equipped with a concealed microphone transmitting device, knocked at defendant's door and was admitted by defendant's son. He then asked to see "BeeBee", defendant's nickname, and when defendant appeared, Barker asked "if he had anything". Defendant responded by saying that he had some "Jones", or heroin. Barker then transacted to buy "a dime bag", or ten dollars worth. After he paid defendant the money, he received two packets of heroin. Barker returned to the car and handed the packets to Eastwood.

During the transaction, the police officers remained in their unmarked car and overheard the conversation between defendant and Barker. At the trial, defendant sought to attack Barker's credibility. The officers were called to testify. One related the conversation, but did not know defendant's voice. The other positively identified defend-

describing them, nor without probable cause, supported by oath or affirmation."

ant's voice. Both substantiated Barker's testimony. Defendant claimed he was in Detroit at the critical time. His witnesses were inconsistent. The jury returned a verdict of guilty.

2.

At the outset, I acknowledge that the state Constitution means what we say it means within the confines of the doctrine of supremacy. We can, and on occasion do, interpret the state constitutional provisions as affording protections beyond those required by the United States Supreme Court as a matter of Federal Constitutional law. I believe that there should be a pragmatic overlay of public policy considerations in each of our more restrictive holdings. There should be a clear perception of what and whom we wish to protect and preserve. Consideration should be afforded to the goods and evils along the road to a desired goal and proper weight assigned to each.

As I see it, my colleagues are primarily concerned with the right to privacy. I share their concern regarding any erosion of that right and constantly wage war against the Big Brother syndrome. However, I do not perceive the trial judge's refusal to suppress the testimony of the two police officers as an invasion of defendant's right to privacy or as an illegal search and seizure—nor would the United States Supreme Court if one may rely upon its prevailing rationale. To suppress the testimony, we then must go beyond the requirements of that Court and interpret the state Constitution which has language comparable to that in the United States Constitution but is "our own".

Therefore we should proceed to pragmatic considerations. First, we must recognize that the use

of hard drugs—and resultant increased criminal activity and human misery—constitutes a major problem of this era. Law enforcement officers are charged with risking their own lives to find and arrest the "purveyors of death". We encourage citizens to help them.

Because of the inherent necessity for privacy in drug sales and the small size of the product, the law enforcement officer has a uniquely difficult task. A sale may take place anytime, anywhere, and be invisible to the observer. Case history reveals that many, perhaps most, sales take place in someone's dwelling place. The business is operated from within living quarters, as here.

Therefore, the very nature of the illegal traffic demands the use of agents and informants if it is to be controlled. However, one may make a "buy" but be met in court by a series of witnesses who swear that the defendant was somewhere else and the purchaser is lying, perhaps to save his own skin. The buyer cannot usually bring anyone with him to verify his testimony. The lone buyer is also in physical danger.

Therefore, as Justice J. W. FITZGERALD admits, "[p]articipant monitoring is practiced extensively throughout the country and represents a vitally important investigative tool of law enforcement". I would not take that tool from them.

Already this Court has minimized the total use of narcotics informants by its opinion in *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), in which we again went beyond the requirements of the United States Supreme Court and enlarged the defense of entrapment. More recently, in *People v Dixon,* 392 Mich 691; 222 NW2d 749 (1974), we suppressed evidence (heroin) seized from one lawfully arrested during a routine custodial search.

Here we would strike an even more crippling blow to the apprehension of narcotics dealers.

Therefore, a careful analysis of constitutional goals and means necessary or desirable towards achievement of these goals is appropriate.

### 3.

Instead of peremptorily using the search warrant sword to chop the Fourth Amendment knot, we should make more of an effort to untie the strands.[2]

Issues of a similar nature have reached the United States Supreme Court. The defendant in *On Lee v United States,* 343 US 747; 72 S Ct 967; 96 L Ed 1270 (1952), had been accused of selling opium. While on bail before trial, he was approached by an undercover agent. The agent wore a transmitter which permitted a member of the narcotics bureau, also named Lee, to monitor conversations. On two separate occasions defendant had incriminating talks with the undercover agent.

At trial the undercover agent did not testify. Agent Lee was permitted to testify as to the conversations he overheard. Defendant was convicted.

In affirming, the Supreme Court said the agent's conduct "did not amount to an unlawful search and seizure such as proscribed by the Fourth Amendment". In responding to defendant's claim

[2] *See* Greenawalt, *The Consent Problem in Wiretapping & Eavesdropping: Surreptitious Monitoring with the Consent of a Participant in a Conversation,* 68 Colum L Rev 189 (1968); Schwartz, *The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order",* 67 Mich L Rev 455 (1969); Scoular, *Wiretapping and Eavesdropping: Constitutional Development from Olmstead to Katz,* 12 St Louis ULJ 513 (1968); and Comment, *Wiretapping and Eavesdropping: A Case Analysis,* 36 Tenn L Rev 362 (1969).

that the agent's conduct was comparable to wiretapping, the Court said:

"The presence of a radio set is not sufficient to suggest more than the most attenuated analogy to wiretapping. Petitioner was talking confidentially and indiscreetly with one he trusted, and he was overheard. This was due to aid from a transmitter and receiver, to be sure, but with the same effect on his privacy as if agent Lee had been eavesdropping outside an open window. The use of bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon what one supposes to be private indiscretions. It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure. We find no violation of the Fourth Amendment here."

In *Lopez v United States,* 373 US 427; 83 S Ct 1381; 10 L Ed 2d 462 (1963), the defendant was convicted of attempting to bribe an IRS agent. He asked the Court to exclude a wire recording of conversations between himself and the agent. The agent testified at trial and the recordings were used for corroboration.

The Court rejected defendant's argument that the agent had unlawfully invaded his office:

"Davis was not guilty of an unlawful invasion of petitioner's office simply because his apparent willingness to accept a bribe was not real. Compare *Wong Sun v United States,* 371 US 471 [83 S Ct 407; 91 L Ed 2d 441 (1963)]. He was in the office with petitioner's consent, and while there he did not violate the privacy of the office by seizing something surreptitiously without petitioner's knowledge. Compare *Gouled v United*

*States* [255 US 298; 41 S Ct 261; 65 L Ed 647 (1921)]. The only evidence obtained consisted of statements made by Lopez to Davis, statements which Lopez knew full well could be used against him by Davis if he wished."

Once past this hurdle the Court said the "case involves no 'eavesdropping' whatever in any proper sense of the term". The recording device was not introduced "by means of an unlawful physical invasion" of defendant's premises but "was carried in and out by an agent who was there with petitioner's assent". After noting this case's similarity to *Rathbun v United States,* 355 US 107; 78 S Ct 161; 2 L Ed 2d 134 (1957),[3] the Court concluded the risk defendant took in offering the bribe "fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording".

Compare *Osborn v United States,* 385 US 323; 87 S Ct 429; 17 L Ed 2d 394 (1966), where the recording was authorized by two district court judges although a search warrant was not issued. The Court approved but did not require judicial authorization prior to consensual participation in recording of conversations.[4]

In *Lewis v United States,* 385 US 206; 87 S Ct 424; 17 L Ed 2d 312 (1966), a government agent obtained narcotics during transactions completed in defendant's home. The agent obtained entry "by

---

[3] In *Rathbun,* the Court held that "the contents of a communication overheard on a regularly used telephone extension with the consent of one party to the conversation are admissible in federal court". The decision was based on statutory interpretation; a Fourth Amendment analysis was not involved. The Court felt telephone conversers take "the risk that the other party may have an extension telephone and may allow another to overhear the conversation".

[4] *Also see Berger v New York,* 388 US 41; 87 S Ct 1873; 18 L Ed 2d 1040 (1967).

misrepresenting his identity and stating his willingness to purchase narcotics".

Acknowledging that "the home is accorded the full range of Fourth Amendment protections" the Court said when the home becomes a market place for unlawful business, "that business is entitled to no greater sanctity than if it were carried on in the store, a garage, a car, or on the street". The Court concluded with the following excerpt from the government's brief:

" 'In short, this case involves the exercise of no governmental power to intrude upon protected premises; the visitor was invited and willingly admitted by the suspect. It concerns no design on the part of a government agent to observe or hear what was happening in the privacy of a home; the suspect chose the location where the transaction took place. It presents no question of the invasion of the privacy of a dwelling; the only statements repeated were those that were willingly made to the agent and the only things taken were the packets of marihuana voluntarily transferred to him. The pretense resulted in no breach of privacy; it merely encouraged the suspect to say things which he was willing and anxious to say to anyone who would be interested in purchasing marihuana.' "

Justices Brennan and Fortas concurred solely on the basis that defendant's apartment "was not an area protected by the Fourth Amendment as related to the transactions in the present case".

The defendant's conviction in *Hoffa v United States,* 385 US 293; 87 S Ct 408; 17 L Ed 2d 374 (1966), was based, in part, on the testimony of Edward Partin, an informer who frequently visited defendant's hotel room. The Court said the Fourth Amendment protects "the security a man relies

upon when he places himself or his property within a constitutionally protected area".

"In the present case, however, it is evident that no interest legitimately protected by the Fourth Amendment is involved. It is obvious that the petitioner was not relying on the security of his hotel suite when he made the incriminating statements to Partin or in Partin's presence. Partin did not enter the suite by force or by stealth. He was not a surreptitious eavesdropper. Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing."

The Court said the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it".

A different situation existed in *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967).[5] Government agents tapped the telephone wires of a booth from which defendant conversed with others, all assuming that their conversations were private. The evidence gathered by these means was introduced at trial. In reversing defendant's conviction, the Court held that the government's conduct "violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted" a Fourth Amendment search and seizure. The Fourth Amendment "protects people—and not simply

[5] *See* Kitch, *Katz v United States: The Limits of the Fourth Amendment,* 1968 S Ct Rev 133; Note, *From Private Places to Personal Privacy: A Post-Katz Study of Fourth Amendment Protection,* 43 NYU L Rev 968 (1968); and Comment, *Permissible Eavesdropping Under the Berger and Katz Standards,* 1969 Tol L Rev 419.

'areas'—against unreasonable searches and sei-
zures".

The Court refused to apply *Katz* retroactively.
*Desist v United States,* 394 US 244; 89 S Ct 1030;
22 L Ed 2d 248 (1969). Since *Katz* was such a
substantial departure from precedent, the majority
did not believe it should invalidate actions taken
in reliance on that precedent.

From a situation similar to this case arose the
issue in *United States v White,* 401 US 745; 91 S
Ct 1122; 28 L Ed 2d 453 (1971). Although the party
who wore the transmitter was unavailable, the
testimony of the agents who listened was admit-
ted. The issue was

"whether the Fourth Amendment bars from evidence
the testimony of governmental agents who related cer-
tain conversations which had occurred between defend-
ant White and a government informant, Harvey Jack-
son, and which the agents overheard by monitoring the
frequency of a radio transmitter carried by Jackson and
concealed on his person. On four occasions the conver-
sations took place in Jackson's home; each of these
conversations was overheard by an agent concealed in a
kitchen closet with Jackson's consent and by a second
agent outside the house using a radio receiver. Four
other conversations—one in respondent's home, one in
a restaurant, and two in Jackson's car—were overheard
by the use of radio equipment. The prosecution was
unable to locate and produce Jackson at the trial and
the trial court overruled objections to the testimony of
the agents who conducted the electronic surveillance.
The jury returned a guilty verdict and defendant ap-
pealed."

The Court of Appeals had read *Katz* as overruling
*On Lee* and reversed defendant's conviction.[6]

---

[6] *See* discussion of *White* at 36 Albany L Rev 451 (1972), 47 ND L
Rev 172 (1971), 17 Vill L Rev 350 (1971), and 1972 Wash ULQ 137.

Six justices then voted to reverse the Court of Appeals.

In Justice White's plurality opinion, he did not read *Katz* as indicating "in any way that a defendant has a justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police". Reaffirming his subscription to the *On Lee, Lopez, Lewis* and *Hoffa* decisions, the justice made this analysis:

"Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa v. United States,* 385 U.S., at 300–303. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez v. United States, supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee v. United States, supra.* If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom defendant is talking and whose truthworthiness the defendant necessarily risks."

Justice Black concurred on the basis of his *Katz* dissent indicating that overheard conversations are not protected by the Fourth Amendment.

Justice Brennan, although agreeing with rever-

sal, entered the debate by concluding that *On Lee* and *Lopez* are no longer sound law:

"In other words, it is my view that current Fourth Amendment jurisprudence interposes a warrant requirement not only in cases of third-party electronic monitoring (the situation in *On Lee* and in this case) but also in cases of electronic recording by a government agent of a face-to-face conversation with a criminal suspect, which was the situation in *Lopez.*"

The dissenting Justices, Douglas, Harlan and Marshall, also believed that *On Lee* and *Lopez* contained outmoded rules.

If we assume that *Katz* leaves previous holdings undisturbed, we must decide whether the actions in this case violated a justifiable reliance upon the privacy of the home. In *Lopez, Lewis,* and *Hoffa,* the Court said when defendant's office or home or room is the scene of unlawful conduct and when the police agent is there with defendant's consent, there is no unconstitutional intrusion upon the defendant's privacy.

If we assume that *Katz* leaves previous holdings undisturbed, we must decide whether the actions in this case violated a justifiable reliance upon the privacy of the conversations. Both *Katz* and *Desist* concern non-consensual electronic eavesdropping upon private conversations by third parties. They do not protect the individual against the possibility that a party to the conversation will broadcast *(On Lee),* record *(Lopez)* or repeat *(Hoffa)* the conversation. The interest isolated and protected by *Katz* is not present here.

If we assume that *Katz* overrides previous holdings, we must determine whether the actions in this case "violated the privacy upon which [defendant] justifiably relied" while using his home as a

distribution center for narcotics. In *Katz,* the Court's statement that "the Fourth Amendment protects people, not places" was followed by this explanation:

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See *Lewis v. United States,* 385 U.S. 206, 210 [87 S Ct 424; 17 L Ed 2d 312 (1966)]; *United States v. Lee,* 274 U.S. 559, 563 [47 S Ct 746; 71 L Ed 1202 (1927)]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See *Rios v. United States,* 364 U.S. 253 [80 S Ct 1431; 4 L Ed 2d 1688 (1960)]; *Ex parte Jackson,* 96 U.S. 727, 733 [24 L Ed 877 (1877)]."

In *Lewis* a government agent obtained narcotics during transactions completed in the defendant's home after the agent obtained entry by concealing his identity and indicating a desire to purchase narcotics. The Court said introducing the narcotics at trial did not violate the Fourth Amendment.

*Katz's* reference to *Lewis* indicates that if narcotics sold in the defendant's home can be introduced, certainly conversations accompanying the transaction can be related at trial without violating the Fourth Amendment. If the conversations are "not a subject of Fourth Amendment protection" then their transmission to the police officers did not violate that provision.

4.

By Federal standards and, I assume, by the standards of the majority of this Court, a record from a device taped to Mr. Barker's body would be admissible in evidence as would be testimony by people listening from a closet or at an open window or viewing the premises with binoculars. Con-

versations can be written down or related to third parties. As a practical matter, monitoring the same consensual conversation through a "walkie-talkie" provides no greater degree of "intrusion".

It serves to encourage defendant's honesty and to protect the life of the agent or informant. He plays a deadly game and the microphone allows him speedy access to help.

Most importantly, it provides a means to protect the courtroom against degrading and flagrant use of perjury.

Further, the very nature of the narcotics trade renders it subject to need for quick action. Otherwise, the "bird will have flown", the opportunity to listen to a "buy" will have been lost. The requirement that the officer first find a magistrate and then try to describe the conversation to be "seized" and the place (under *Katz*, it could be any place, including some sidewalk) where it is to be "seized" and then to go with the warrant (if any) to the scene is designed for self-defeat.

The Court has also failed to indicate exactly when a search warrant is required. Does every instance of consensual third-party monitoring of conversations have to be supported by a warrant even though it is part of an investigation to determine if illegal activity is occurring? How does one specifically describe the conversation to be seized? The Court has given woefully little guidance to those who have to work with this decision.

As noted earlier, if we are to impose controls under the state Constitution which are more strict than those required under the United States Constitution, this Court must assign proper weight to opposing interests and give some consideration to public policy.

The Port Huron officers have interfered with no legitimate constitutional interest. By imposing a warrant requirement, the Court has advanced no public or private interest which justifies suppression of the officers' corroborating testimony.

Defendant had no justifiable expectation of privacy in carrying out his sale of heroin. He had no right to traffic in narcotics free from police interference. He assumed a risk that the purchaser would recall, record, or transmit the conversation.

The conviction should be affirmed.