562 So.2d 770 (1990)
Saud TARAWNEH and Ghada Tarawneh, Appellants,
v.
STATE of Florida, Appellee.
No. 88-2191.
District Court of Appeal of Florida, Fourth District.
May 16, 1990.
Rehearing Denied July 18, 1990.
Geoffrey C. Fleck of Friend & Fleck, South Miami, for appellants.
Robert A. Butterworth, Atty. Gen., Tallahassee, and John Tiedemann, Asst. Atty. Gen., West Palm Beach, for appellee.
STONE, Judge.
Saud and Ghada Tarawneh were convicted of conspiracy to murder their son-in-law Mouataz, his mother (Ghada's sister) Najwa, and his sister (Ghada's niece) Azza. Saud Tarawneh was also convicted of one count of solicitation to commit murder. We affirm.
Mouataz and the defendants' daughter, Raniah, had married over Saud's objection. The testimony revealed a complex history of resulting threats and rancor beginning in the Middle East and culminating in a hostile confrontation in Broward County.
The defendants believed their daughter had been kidnapped by Mouataz and located them in Broward County through private investigators, including Ronald Petrillo. There was testimony that Ghada, during the Florida altercation, threatened both Mouataz and Azza, and stated: "God will kill you, and God is going to kill you, and God is going to kill you and you." Following this incident the defendants continued to express their belief that Raniah was being held against her will.
While in Florida Saud met with Petrillo, telling him that he wanted Mouataz out of his life forever, that Mouataz had ruined his life, and that it could not be made right unless Mouataz was dead. Saud told Petrillo that he wanted something done about it by a person who did "this type of thing." *771 Before leaving Florida Saud told Petrillo that he would wait to hear from him concerning Petrillo's locating an individual "that would fulfill these wishes to have Mouataz killed." In a separate conversation Ghada also told Petrillo that she wanted Mouataz dead.
Twelve days later Petrillo contacted the police. Petrillo then made a series of monitored phone calls to Saud in Ohio. He told Saud that he had found someone who would kill Mouataz. Saud authorized Petrillo to negotiate a price of $2,500.00 for the murder. Petrillo called back and advised Saud that he had made a deal with the third party at that price. They decided to meet at the Detroit airport a few days later.
Saud and Ghada Tarawneh met Petrillo at the Detroit airport. Petrillo was carrying a hidden recording device monitored by local undercover officers. At that meeting both defendants stated that they wanted Mouataz murdered. Ghada expressed a continuing willingness to pawn her jewelry to pay for the killing. Saud asked that a picture be taken of the dead body to prove that the contract had been fulfilled. He also requested that Mouataz's middle finger be cut off because Mouataz had used it during the Florida confrontation to make an obscene gesture. He then instructed that Mouataz's genitals were to be cut off and preserved. Arrangements were made for payment by mail. There was no requirement that payment be received in advance.
Ghada, furious over Azza's interference, ordered that she also be killed and that parts of her anatomy be preserved as well. The defendants further directed Petrillo to have Najwa killed and ordered that her tongue be removed and preserved. They agreed to a code to be used over the phone after completion. The would refer to the dead bodies as "books."
Ghada asserts that she was not a voluntary participant in the agreement. However, the recording of the Detroit conversation and the witness' testimony as to her conduct and appearance reveal her to be a willing conspirator. Not only did she agree to the murders at the airport, she admitted to prior discussions with Saud concerning the planned killing and their avoiding the risk that the hired killer might blackmail them.
The tape of the airport meeting, which contained a one minute gap and some unintelligible spots, is in evidence. The meeting concluded with the agreement that Petrillo would have the murders committed upon his return to Florida.
Appellants first contend that they were denied a fair trial because they were represented by a single law firm, creating a conflict of interest and depriving them of rights, including their right to counsel. Appellants assert that this issue should be considered on direct appeal because the prejudice is apparent. See Fasano v. State, 548 So.2d 1191 (Fla. 4th DCA 1989); Morgan v. State, 550 So.2d 151 (Fla. 3d DCA 1989). But see Healey v. State, 556 So.2d 488 (Fla. 2d DCA 1990). They maintain that their theories of defense were mutually antagonistic because Ghada claimed that she was acting out of fear of abuse by her husband. However, we note that the court warned defendants of a possible conflict at a pretrial hearing. They affirmatively advised the court that they wished to continue with their present counsel. Moreover, the record does not require a conclusion that their defenses were antagonistic. At no time did either implicate the other as to any material matter not acknowledged by the other. See generally United States v. Pirolli, 742 F.2d 1382 (11th Cir.1984), cert. denied, 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985). Our rejection of this argument is without prejudice to the appellants' right to readdress it by a later motion pursuant to Florida Rule of Criminal Procedure 3.850.
Appellants next assert that it was error to deny their motions for judgment of acquittal on the conspiracy counts because there was insufficient evidence that a conspiracy was formed in Florida or was furthered by acts in this state, and Petrillo acted as an agent of the government. See Lane v. State, 388 So.2d 1022 (Fla. 1980); Battle v. State, 365 So.2d 1035 (Fla. 3d *772 DCA 1978), cert. denied, 376 So.2d 76 (Fla. 1979).
Florida Statutes Section 910.005(1)(c) provides for jurisdiction in Florida where "conduct outside the state constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state." Section 910.005(1)(a) confers jurisdiction over offenses "committed wholly or partly within the state."
Our review of the record reveals ample evidence to support a conclusion that the defendants engaged in a conspiracy with each other. There was sufficient action in furtherance of their conspiracy in Florida to provide jurisdiction in this state under Florida Statutes Section 910.005. Cf., United States v. Petit, 841 F.2d 1546 (11th Cir.), cert. denied, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988); State v. Saunders, 508 So.2d 473 (Fla. 4th DCA), rev. denied, 519 So.2d 988 (Fla. 1987); State v. Cristodero, 426 So.2d 977 (Fla. 4th DCA 1982), rev. denied, 436 So.2d 100 (Fla. 1983). See also Cummings v. State, 514 So.2d 406 (Fla. 4th DCA 1987); State v. Bass, 451 So.2d 986 (Fla. 2d DCA 1984). Additionally, Petrillo's involvement in the conspiracy began before he became an informant. We need not address the question of whether either defendant could conspire solely with Petrillo because they were charged and convicted of conspiring with each other. See McCain v. State, 390 So.2d 779 (Fla. 3d DCA 1980), rev. denied, 399 So.2d 1144 (Fla. 1981). Since there is sufficient direct and circumstantial evidence to support a conspiracy between Ghada and Saud, we also need not address whether Ghada's conviction may be sustained because she acquiesced and participated in a conspiracy between Saud and Petrillo. See Cummings v. State, 514 So.2d 406 (Fla. 4th DCA 1987). Clearly the appellants could have been convicted of murder in Florida had the gruesome scheme been carried out by Petrillo as arranged. Cf., Keen v. State, 504 So.2d 396 (Fla. 1987); Lane v. State. Moreover, we find no merger in Saud's separate convictions of both solicitation and conspiracy. E.g., Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); State v. Waskin, 481 So.2d 492 (Fla. 3d DCA 1985), rev. denied, 488 So.2d 69 (Fla. 1986).
Appellants contend that it was error to deny a motion to suppress the tape of the Detroit meeting. They argue that the Michigan magistrate's warrant, permitting the recording of the conversations, was based on a deceptive and exaggerated affidavit. See generally Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); United States v. Ippolito, 774 F.2d 1482 (9th Cir.1985). A magistrate's warrant is required prior to taping any conversation in Michigan. See People v. Beavers, 393 Mich. 554, 227 N.W.2d 511, cert. denied, 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975). Although the affidavit does appear to contain some inaccuracies, we need not determine whether it would pass muster under Michigan law because in Florida a warrant is not required for law enforcement officers to transmit or record a conversation under these circumstances. Morningstar v. State, 428 So.2d 220 (Fla. 1982), cert. denied, 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983).
Evidence that is validly obtained in another state is admissible into evidence in this state, even if it is obtained through a warrant that would have been invalid if issued in Florida. McClellan v. State, 359 So.2d 869 (Fla. 1st DCA), cert. denied, 364 So.2d 892 (1978). Although the circumstances here are inverse to those in McClellan, even if the warrant were subject to attack in Michigan, exclusion of this evidence in Florida would have no deterrent or remedial effect in either state. Cf., Echols v. State, 484 So.2d 568 (Fla. 1985), cert. denied, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986); State v. Lucas, 372 N.W.2d 731 (Minn. 1985). In any event, the errors in the affidavit appear to be of little material significance. Further, there is no reason to assume that a Michigan court would not sustain this warrant, notwithstanding some inaccurate statements in the affidavit. Cf. State v. Hunwick, 434 So.2d 1000 (Fla. 4th DCA 1983); State v. Stokes, 550 So.2d 519 (Fla. 1st DCA 1989).
*773 We have considered the other issues raised by appellants and find them to be without merit. The judgments and sentences are affirmed.
HERSEY, C.J., and LETTS, J., concur.