The STATE of Utah, Plaintiff
and Respondent,

v.

David Edward ALBO, Defendant
and Appellant.

Nos. 15351, 15352.

Supreme Court of Utah.

Sept. 15, 1978.

---

Lynn R. Brown of Salt Lake Legal Defender Ass'n, Salt Lake City, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Michael L. Deamer, Deputy Atty. Gen., Craig L. Barlow, Asst. Atty. Gen., R. Paul Van Dam, Salt Lake County Atty., Salt Lake City, for plaintiff and respondent.

ELLETT, Chief Justice:

The appellant, Albo, was tried jointly with Gayle Boone and both were convicted by a jury. Boone appealed and his conviction was affirmed by this Court on July 11, 1978.[1] See that case for the facts underlying the charge herein.

An undercover agent arranged with Boone to pay $1,000.00 for one ounce of tetrahydrocanibol, the active ingredient in marijuana which is a controlled drug. An arrangement was made for delivery of the substance, but when the agent arrived Boone told him to take a break as "his man" had not yet arrived and later told the agent that his delivery man would be driving a white Continental automobile. After a while the appellant, Albo, did arrive in a white Continental Mark IV. The agent went inside the building where the parties had met and a few minutes later Boone entered and handed the agent a plastic bag containing a brown powder which proved to be phencyclidine, a controlled substance. The agent handed Boone 50 twenty-dollar bills, the numbers of which had been recorded by the police. The two then exited the building, and Boone got in the Mark IV with Albo. The agent had given a signal that a sale had been made and the police immediately appeared and arrested Boone and Albo. At that time they were counting out the fifty bills of which Albo had forty nine and Boone one.

During the trial, a narcotics agent was allowed to testify about a conversation he had with Gayle Boone, in which Boone made a number of statements that incriminated appellant. A tape recording of that conversation was also admitted. When appellant objected to admission of the evidence against him, claiming it was barred as hearsay, the court admonished the jury

---

1. *State v. Boone*, Utah, 581 P.2d 571 (1978).

that at that time the evidence was admissible only against co-defendant Boone.

Subsequently independent evidence was admitted which established against Boone and appellant a prima facie case of conspiracy to distribute a controlled substance. That evidence consisted of the arrival of appellant at the location of the drug sale, the approach of Boone, empty-handed to appellant's car, the return to the gym of Gayle Boone, clutching a plastic bag containing a brown substance, later proven to be PCP, and the subsequent entry of Boone into appellant's car where police interrupted him counting out several hundred dollars to appellant, who put the money in his pocket.

The court instructed the jury as follows: "During the course of this trial the Court has received testimony and evidence of conversations between the defendant Gayle Lee Boone and Kayle Shaw, Jr. aka Mike Days with the admonition from the Court that such testimony is not to be considered as evidence against the co-defendant David Edward Albo. Under the rules of evidence of the State of Utah, such testimony and evidence is hearsay unless there has been evidence presented which proves to your satisfaction, and beyond a reasonable doubt that the declarant, Gayle Lee Boone, and the co-defendant, David Edward Albo, were participating in a plan to commit a crime and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination. If you so find, you may consider any and all statements made by the defendant Boone to Kayle Shaw aka Mike Days as substantive evidence against the defendant Albo."

 The appellant now claims that the court erred. However, he made no objection to the instruction until the jury had returned with their verdict and the time for sentencing had arrived. Anyway the instruction was proper. While it is the province and duty of the judge to determine the

admissibility of evidence in the first place, he does this by admitting it in the Case. Here the judge had admitted the evidence and told the jury that if it convinced them beyond a reasonable doubt that Albo and Boone were engaged in a plan to commit a crime, etc. that they could consider the evidence against both defendants.

The legality of the monitoring of the conversation between Boone and the agent and the further assignments of error [2] were each decided in the appeal of Boone (note 1 above) which is dispositive of the matters here.

The evidence was such that the jury could and should believe that Boone and Albo were working together and the conversation was admissible against Albo although it was not required in order to justify the verdict. It is obvious that the two defendants were engaged in bigtime unlawful dope peddling: that Albo was the wholesaler and Boone the retailer.

This appeal is from a case where a bigtime dealer in drugs was caught red-handed in his nefarious dealings, and it would be a disgrace to the court to free him on any claimed immaterial technique.

The judgment is affirmed.

CROCKETT and HALL, JJ., concur.

WILKINS, J., concurs in result.

MAUGHAN, Justice (dissenting):

Appellant was convicted of Unlawful Distribution of a Controlled Substance for Value. The facts are as follows.

An undercover narcotics agent, Kayle Shaw, arranged for a buy of narcotics from appellant's co-defendant. Prior to the meeting, Shaw was given $1,000 and wired with a hidden electronic transmitter which would broadcast Shaw's conversations to police officers, who were in the area. Shaw drove his car to the meeting place, where he and the co-defendant awaited the arrival of appellant. After appellant arrived, the co-

---

2. Consisting of permitting testimony of other bad acts of the defendant, improper remarks of the prosecutor, refusal to compel an attorney for a witness to divulge confidential communications, and failure to grant a continuance.

defendant exchanged a bag containing the drug for Shaw's $1,000, and got into appellant's car. By means of the transmitter, the conversation between the co-defendant and Shaw was overheard by police officers surrounding the area, and was also recorded on tape. Shaw transmitted a pre-arranged signal to indicate the buy had been made, and police agents arrested appellant and his co-defendant. The police did not attempt to obtain a search warrant prior to the transmission and recording of the conversation.

At trial, the tape recording of the co-defendant's conversation with Shaw was received into evidence, over the objection of counsel for appellant.

The Fourth Amendment to the Constitution of the United States states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be searched.

Article I, Sec. 14 of the Utah Constitution is virtually identical. The rights protected by these provisions extend to people, not to property or places.[1] Because these concepts are so basic, yet so elusive, we must always bear in mind the essence of the Fourth Amendment is to protect privacy.[2]

The threats to this right of privacy which concerned our forefathers took the form of physical entry, forceful seizure and violence upon the person. They could not be expected to have foreseen the far more intricate and subtle methods of intrusion which have developed with the use of sophisticated electronic eavesdropping. Yet the latter can be far more dangerous and oppressive to a free society than the former; for unrestrained electronic "bugging" carries the potential of smothering routine and spontaneous exchange that we daily take for granted, and which constitutes the very basis for the freedoms guaranteed under the Constitution. Faced with the extraordinary advances in science which have enabled law enforcement officers to literally broadcast openly to strangers a whisper made in confidence to a friend, we should remember the words of the U.S. Supreme Court in *Weems v. United States:*[3]

> Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> In the application of a constitution, therefore, our contemplation cannot be only of what has been, but what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value, and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality.[4]

In analyzing the breadth of the Fourth Amendment, and Article I, Sec. 14 of the Utah Constitution attention must be paid to

---

1. The State makes a strained attempt to persuade us the Michigan Supreme Court action cannot be followed in Utah, (see footnote 16, infra) because our statutory definition of a search warrant speaks only of searches for "personal property," and not "things" as does Michigan's analogous statute. Thus the State reasons, a magistrate would not issue a warrant in a case such as this, because a conversation is a "thing" but not personal property. This argument is untenable. Even accepting the State's technical distinction between "personal property" and "things," the Utah Constitution clearly allows a search warrant to be issued for a "thing," and it prevails over 77–

54–1. In addition, 77–54–3 echoes the constitutional language allowing a search warrant for a "person or thing to be seized." The statutory definition of a search warrant is no obstacle whatsoever to the issuance of a warrant in a case such as this.

2. *Warden v. Hayden,* 387 U.S. 294, 304, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

3. 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

4. 217 U.S. at 373, 30 S.Ct. at 551, 54 L.Ed. at 801.

the words of Justice Brandeis in his dissent in *Olmstead v. United States.*[5] Written in 1928 they are piercing and prophetic:

> . . . But 'time works changes, brings into existence new conditions and purposes.' Subtler and more far-reaching means of invading privacy have become available to the government. Discovery and invention have made it possible for the government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet.
>
> Moreover, 'in the application of a Constitution, our contemplation cannot be only of what has been, but of what may be.' The progress of science in furnishing the government with means of espionage is not likely to stop with wire tapping. Ways may some day be developed by which the government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home. Advances in the psychic and related sciences may bring means of exploring unexpressed beliefs, thoughts and emotions. 'That places the liberty of every man in the hands of every petty officer' was said by James Otis of much lesser intrusions than these. To Lord Camden, a far slighter intrusion seemed 'subversive of all the comforts of society.' Can it be that the Constitution affords no protection against such invasions of individual security?

\* \* \* \* \* \*

> . . . [The makers of our Constitution] recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of

the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment.[6]

Recognizing opinions to the contrary, I can only come to the conclusion that warrantless third person monitoring,[7] such as exists in this case, is forbidden by the Fourth Amendment.

In agreement with this conclusion were Justices Harlan, Douglas, Brennan and Marshall in *United States v. White.*[8] In that case, very similar to this, government agents overheard conversations between the defendant and an informant who had a concealed transmitter on his person. These agents later testified to what they heard at the trial of defendant for violation of federal narcotics laws. Justice White wrote an opinion in which Justices Stewart and Blackman, and Chief Justice Burger concurred, expressing the view that such monitoring does not violate the Fourth Amendment. The rationale of this plurality opinion is summed up by Justice White's own statement:

> If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations

5. 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

6. 277 U.S. at 473, 474, 478, 48 S.Ct. at 570, 72 L.Ed. at 954, 956.

7. By "third person monitoring," I refer to the use of an electronic device by a participant to a conversation, which transmits the exchange to third persons, or electronic eavesdropping by

third persons upon a conversation of unsuspecting parties.

8. 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). The plurality opinion in White stands only for the proposition that *Katz v. United States* (Footnote 15), could not be retroactively applied. See *People v. Pulley,* 66 Mich.App. 321, 239 N.W.2d 366 (1976).

which are later offered in evidence to prove the State's case.[9]

As Justice Harlan points out in his dissent, the above reasoning is based on two assumptions, first, there is no greater invasion of privacy in the third party situation, and second, uncontrolled participant monitoring in this electronic age is a tolerable technique of law enforcement.

Regarding the first assumption, we should remember that uncontrolled third party monitoring subjects not only wrongdoers to the risk of such eavesdropping, but each and every person in our society. Without the protection of probable cause before a neutral magistrate, the rights of society as a whole are necessarily infringed upon. In the words of Justice Harlan:

> Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates daily life.
> . . . [10]

Some believe there is no difference between conventional police tactics such as the use of informants and disguise, and electronic transmission of conversations to third parties. I believe there is a constitutionally significant distinction. As Justice Brennan, in *Lopez v. United States* has stated: [11]

> The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak. But as soon as electronic surveillance comes into play, the risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy. . . . [12]

Although one may well misplace his confidence in another who is actually a government agent, one should nevertheless be able to have some control over the extent of audience addressed and the persons one chooses to confide in, free from the fear of uncontrolled, unjustified electronic searches.

With the many advanced surveillance techniques now available for law enforcement, reliance upon police self-restraint alone is unwise. Such is an incipient stage of a police state. Even well-meaning conduct may inadvertently trample upon fundamental freedoms. Indeed, the attacks on these fundamental freedoms by well-meaning men of zeal are fraught with more danger than are those grounded on evil intent. Daily, these freedoms are under attack; from both flanks.

As to the second assumption, I am constrained to believe, when the potential intrusion of individual liberties is weighed against the usefulness of this particular law enforcement technique, the scales tip in favor of protecting the sensitive individual rights here involved. The goal of such third party monitoring, with which I have no quarrel, can just as effectively be attained where the reasonableness requirement is met by the prior issuance of a warrant. Since these surveillance techniques are set up by law enforcement officers and planned in advance, no significant obstruction to obtaining a warrant exists.

We are not dealing here with situations presenting legitimate and necessary exceptions to the requirement of the warrant, such as moving vehicles,[13] or searches inci-

9. 401 U.S. at 752, 91 S.Ct. at 1126, 28 L.Ed.2d at 459.

10. 401 U.S. at 787, 91 S.Ct. at 1144, 28 L.Ed.2d at 479.

11. 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

12. 373 U.S. at 465, 83 S.Ct. at 1402, 10 L.Ed.2d at 486.

13. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

**912**

dent to arrests.[14] A basic constitutional principle is well established, that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."[15] They can hardly be styled as immaterial technicalities, as is done in the main opinion.

The central operating feature of the Fourth Amendment is to require the detached reflection of a magistrate to insure antecedent justification for search warrants. No reason exists for not extending that protection to the search conducted in this case. No unreasonable interference with the efficiency of law enforcement procedures will result. No new exception to the warrant requirement should be infused into the law, particularly one not grounded upon "exigent circumstances," or the safety of police officers.

The Michigan Supreme Court has also rejected the reasoning of the plurality opinion in *United States v. White.* In a case involving facts similar to the case at bar, the Michigan Court stated:

> Participant monitoring is practiced extensively throughout the country and represents a vitally important investigative tool of law enforcement. Equally significant is the security and confidence enjoyed by our citizenry in knowing that the risk of intrusion by this type of electronic surveillance is subject to the constitutional protection against unreasonable searches and seizures. By interposing the search warrant requirement prior to engaging in participant monitoring, the risk that one's conversation is being intercepted is rightfully limited to circumstances involving a party whose conduct has provided probable cause to an independent magistrate to suspect such party's involvement in illegal activity.

The warrant requirement is not a burdensome formality designed to protect those who would engage in illegal activity, but, rather a procedure which guarantees a measure of privacy and personal security to *all* citizens.[16]

Similarly, I believe the mandate of the Fourth Amendment to be clear, and the interests at stake, which are shared by all citizens, fundamental. When balanced against the relatively light burden of complying with the procedures for obtaining a warrant, the former prevail. The conviction should be reversed.

---

**14.** *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *State v. Lopez,* Utah, 552 P.2d 120 (1976).

**15.** *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967).

**16.** *People v. Beavers,* 393 Mich. 554, 227 N.W.2d 511 (1975).