COMMONWEALTH vs. FRANCIS THORPE.

Middlesex. April 7, 1981. — August 5, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & NOLAN, JJ.

*Search and Seizure,* Wiretap, Electronic surveillance. *Eavesdropping.*
*Constitutional Law,* Search and seizure.

For purposes of determining whether a warrantless interception of oral
communications is permitted by G. L. c. 272, § 99 B 4, which ex-
empts from the general prohibition against warrantless interceptions
any interception by a law enforcement officer, with the consent of a
party to the communication, when the officer is investigating a desig-
nated offense involving organized crime, "organized crime," as de-
fined under c. 272, § 99 A, Preamble, is "a continuing conspiracy
among highly organized and disciplined groups to engage in supplying
illegal goods and services." [275-277] LIACOS, J., dissenting.
In a proceeding on a motion to suppress certain tape recordings pursuant
to G. L. c. 272, § 99 P, by a defendant charged with corrupting a
municipal official, evidence that the defendant had offered to sell a
police officer a copy of a forthcoming sergeant's examination which
the defendant said was available to him through an organization head-
ed by a woman, taken together with the permissible inference that a
certain amount of discipline and organization would be necessary to
acquire and supply such an examination illicitly, warranted a finding
that law enforcement officials' decision to intercept communications
between the defendant and the officer was based on a reasonable sus-
picion that such interception would disclose or lead to evidence of a
designated offense involving organized crime as required by c. 272,
§ 99 B 4. [278-281] LIACOS, J., dissenting.
The warrantless recording of conversations between a defendant and a
police officer, with the officer's consent, did not violate the defendant's
right to be free from unreasonable searches and seizures as guaranteed
by art. 14 of the Massachusetts Declaration of Rights where the de-
fendant had sought out the police officer, knowing him to be a police
officer, and where the interception was based on a reasonable suspi-
cion that it would disclose or lead to evidence of a designated offense
involving organized crime as required by G. L. c. 272, § 99 B 4.
[282-286]

INDICTMENT found and returned in the Superior Court Department on February 7, 1979.

A motion to suppress evidence was heard by *Hallisey*, J.

An application for an interlocutory appeal filed in the Supreme Judicial Court for the county of Suffolk was granted by *Kaplan*, J., and the appeal was reported by him.

*Edward J. McCormick, III,* for the defendant.

*Frederick W. Riley,* Assistant Attorney General, for the Commonwealth.

HENNESSEY, C.J. This case involves the construction of the Massachusetts communications interception statute, G. L. c. 272, § 99, as appearing in St. 1968, c. 738, § 1. Prior to trial in the Superior Court on the charge of corrupting a municipal official under G. L. c. 268A, § 2 (*a*) (2), the defendant Francis Thorpe moved, pursuant to G. L. c. 272, § 99 P, to suppress certain tape recordings of conversations between himself and the Commonwealth's chief witness. After a hearing, the judge denied the motion. Thorpe sought and was granted leave to file an interlocutory appeal. See Mass. R. Crim. P. 15 (b) (2), 378 Mass. 884 (1979). We affirm the denial of the motion to suppress.

We summarize the background as set forth in the judge's memorandum of decision. The Commonwealth expects to prove at trial that Thorpe, a former police officer retired on disability, offered to sell a copy of a police sergeant's promotional examination to David McCue, a Wilmington police officer planning to take the October 21, 1978, examination.

On October 6, 1978, Thorpe telephoned McCue, who recognized Thorpe's voice. Thorpe ascertained that McCue was studying for the sergeant's examination and said that the examination was available to Thorpe through an organization headed by a woman. He offered to sell McCue the examination for $4,000 and said he would meet McCue on October 10, 1978.

McCue immediately contacted the Wilmington town manager and town counsel, who decided to report the matter to the Attorney General's office. With the cooperation

of that office and the State police, plans were made to record subsequent conversations between McCue and Thorpe. No attempt was made to obtain a warrant under the procedure outlined in G. L. c. 272, § 99. The town manager decided that Officer McCue, as part of his regular duties for the town of Wilmington, would work with the Attorney General's office and the State police on the investigation of Thorpe, and so informed the chief of the Wilmington police department.[1]

On October 9, 1978, the day before the scheduled meeting with Thorpe, a State trooper outfitted McCue with a "Kel Kit," a short-range radio transmission device secreted on the body and designed to transmit to a receiver, here operated by a State trooper who would tape record any conversation. Thorpe did not show up at the October 10, 1978, meeting. Arrangements were then made for McCue to record his telephone conversations with Thorpe. Using the recording equipment supplied by the State police, McCue recorded approximately eight telephone conversations with Thorpe, either from McCue's home in Wilmington or from an electronic equipment room at the Attorney General's office, from October 12 to November 6, 1978. He also recorded two face-to-face meetings with Thorpe on October 20, 1978, using the Kel Kit. The thrust of the various recorded telephone conversations was when and how McCue would receive the examination, and whether a price lower than $4,000 would be acceptable. During the first recorded conversation, Thorpe said he would have to get back to "her," presumably the woman heading up the organization he had referred to earlier, before he could make any definite arrangements with McCue. Thorpe also indicated that misappropriation of examinations was an ongoing operation and that the "program" was normally offered to just one policeman in each city or town, and only if that person could be trusted. The next morning, Thorpe

---

[1] Under St. 1950, c. 592, § 12, the town manager of Wilmington has supervisory authority over the administration of the police department, including the power to appoint and remove police officers.

telephoned McCue, urged complete secrecy, and told him
he was not to get a perfect score on the examination, but
everything would be arranged for him in advance. On Oc-
tober 19, 1978, McCue had another telephone conversation
with Thorpe, during which Thorpe said he expected to hear
something later on that night and reassured McCue that
there was no problem. During a later conversation Thorpe
arranged to meet McCue in front of a restaurant in North
Andover. McCue used the Kel Kit to record the brief con-
versation with Thorpe, the gist of which was that Thorpe
wanted McCue to take a ride to a safer place. McCue, fear-
ing for his safety, refused. After the two parted, a State
trooper observed Thorpe making a fifteen-to-twenty-
minute call from a pay telephone.

When McCue spoke to Thorpe on the telephone later that
afternoon, Thorpe said there would be eighty questions on
the examination, three involving diagrams. In discussing
the scheme of operations, and Thorpe's "sponsorship" of
McCue, Thorpe referred to the "committee . . . originated
by this broad." A few hours later, during a telephone con-
versation that was poorly recorded, McCue sought another
meeting with Thorpe, who said he did not have the exami-
nation and had to make a couple of telephone calls. Still
later, the two arranged to meet at a doughnut shop in Law-
rence. McCue, equipped with the Kel Kit and $4,000, met
Thorpe as planned and asked for the examination answers
that he thought Thorpe was going to bring. Thorpe did not
have them. McCue offered the $4,000, but Thorpe refused
unless they went to a safe place, and broke off negotiations
when McCue declined to leave with him. Shortly after-
wards, Thorpe was seen making a twenty-to-thirty-minute
call from a pay telephone.

The Sergeant's examination was given on October 21,
1978. As predicted by Thorpe, it contained eighty ques-
tions, three involving diagrams.

Pursuant to G. L. c. 272, § 99 P,[2] Thorpe moved to sup-
press the tape recordings. In denying Thorpe's motion to

_____

[2] General Laws c. 272, § 99 P, allows defendants in criminal cases to
move to suppress the contents of any intercepted wire or oral communica-

suppress, the judge dismissed Thorpe's contentions that the recording of his conversations violated the Fourth Amendment to the United States Constitution, and art. 14 of the Massachusetts Declaration of Rights. He also concluded that the electronic surveillance did not violate the Federal wiretap statute, 18 U.S.C. § 2518 (1976), or the State interception statute, G. L. c. 272, § 99. In arguing that the motion to suppress should have been granted, Thorpe advances on appeal the same arguments as he did below, with the exception of the Fourth Amendment challenge, which he has abandoned.

1. *The Organized Crime Requirement of G. L. c. 272, § 99.*

Thorpe's primary contention on appeal is that the warrantless interception violated G. L. c. 272, § 99, because the requisite organized crime nexus was not shown. For purposes of the statute, interception is defined as the use of an intercepting device to secretly hear or record, or aid another to secretly hear or record, the contents of any wire or oral communication. G. L. c. 272, § 99 B 4. The statute is framed largely in negative terms: clandestine overhearing or recording of communications is prohibited except as otherwise specifically provided. G. L. c. 272, § 99 C. The exceptions to the statutory prohibition include "any person duly authorized to make specified interceptions by a warrant issued pursuant to this section." G. L. c. 272, § 99 D 1 d.[3] Additionally, the following do not constitute interceptions for purposes of the statute: (1) when all parties to

---

tion or evidence derived therefrom if the communication was obtained by means of an unlawful interception.

[3] The procedure for obtaining a warrant to lawfully intercept communications is spelled out in G. L. c. 272, § 99 E. Before a warrant may issue, a judge must be convinced "that there is probable cause to believe that a designated offense has been, is being, or is about to be committed" and that interception would lead to evidence of such offense. G. L. c. 272, § 99 E 2. Further, there must be a showing that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." G. L. c. 272, § 99 E 3. For a discussion of the statutory warrant procedure, see *Commonwealth* v. *Vitello*, 367 Mass. 224, 231-233 (1975).

the communication consent in advance to the use of the intercepting device; (2) when the interceptor is an investigative or law enforcement officer who is investigating a "designated offense," and who either (a) is a party to the communication or (b) has a party's advance authorization to the interception of the communication. G. L. c. 272, § 99 B 4. "Designated offense," in turn, is defined to encompass a wide spectrum of crimes, including extortion and bribery, when the offenses are "in connection with organized crime as defined in the preamble." G. L. c. 272, § 99 B 7.

The Commonwealth justifies its warrantless recording of the conversations between Thorpe and McCue on the basis of the § 99 B 4 exception for law enforcement officers, and the judge denied the motion to suppress on that ground. Thorpe argues that the evidence demonstrates at most an isolated, solitary criminal act on his part, and that the judge therefore erred in finding organized criminal activity.[4]

The initial question we face, then, is how organized crime is to be defined and proved for purposes of bringing warrantless surveillance by law enforcement officers within the § 99 B 4 exception. We must decide what part of the preamble, set forth in its entirety in the margin,[5] the Legis-

---

[4] We need not dwell on Thorpe's additional argument that McCue was not a law enforcement or investigative officer authorized to make warrantless recordings under G. L. c. 272, § 99 B 4. The statutory definition of "investigative or law enforcement officer" covers "any officer of the United States, a state or political subdivision of a state, who is empowered by law to conduct investigations of, or to make arrests for, the designated offenses, and any attorney authorized by law to participate in the prosecution of such offenses." G. L. c. 272, § 99 B 8. Officer McCue, as a member of the Wilmington police department, was an "officer of . . . a political subdivision of [the] state" and had the power to conduct investigations of bribery. Furthermore, McCue's actions in connection with the Thorpe investigation were undertaken at the behest of and in conjunction with members of the State police and the Attorney General's office, who themselves may be classified as investigative or law enforcement officers under § 99 B 8.

[5] "The general court finds that organized crime exists within the commonwealth and that the increasing activities of organized crime constitute a grave danger to the public welfare and safety. Organized crime, as it exists in the commonwealth today, consists of a continuing conspiracy

lature intended as the definition of organized crime. We agree with the judge that, although the Legislature declared that the definition of organized crime is to be found in the preamble, the entire description of organized crime could not have been intended to be incorporated in the definition of designated offenses. The statute would be unworkable if the Commonwealth were required to prove, in every case, that the activities constituted "a grave danger to the public welfare and safety," that "brutal and violent tactics" were employed and that "legitimate business activities" were being infiltrated. Rather, of all the language used in the preamble, it appears that the Legislature intended to define organized crime as "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services."[6]

---

among highly organized and disciplined groups to engage in supplying illegal goods and services. In supplying these goods and services organized crime commits unlawful acts and employs brutal and violent tactics. Organized crime is infiltrating legitimate business activities and depriving honest businessmen of the right to make a living.

"The general court further finds that because organized crime carries on its activities through layers of insulation and behind a wall of secrecy, government has been unsuccessful in curtailing and eliminating it. Normal investigative procedures are not effective in the investigation of illegal acts committed by organized crime. Therefore, law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities.

"The general court further finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited. The use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime." G. L. c. 272, § 99 A, Preamble.

[6] Statutory definitions of organized crime prevailing in other States similarly focus on the elements of organization, discipline, and the provision of illegal goods and services. See N.H. Rev. Stat. Ann. § 570-A:1, XI (1974); N.M. Stat. Ann. § 29-9-2 (1978); Tenn. Code Ann. § 38-502 (1975).

The dissenting opinion relies on the legislative history of the Federal wiretap statute, 18 U.S.C. § 2518 (1976), particularly Sen. Rep. No. 1097, 90th Cong., 2d Sess., [1968] U.S. Code Cong. & Ad. News. *Post* at

The judge here concluded that the evidence showed a continuing conspiracy by a well-organized and disciplined group to supply illegally the civil service examinations. Thorpe disputed this, arguing that nothing in the record indicates he had any connection with anyone else in selling the examinations. This contention is plainly wrong, as the record is replete with evidence of an "organization," a "committee," and the need for Thorpe to get approval from others before furnishing McCue with the examination questions and answers. Most such evidence, however, stems from the tape-recorded conversations themselves. In seeking to come within the § 99 B 4 exception, the Commonwealth may not rely on evidence of organized criminal activity gathered from the warrantless surveillance itself. There must be some showing of an organized crime connection *before* the surveillance, not afterward.

In concluding that those involved in the sale of the examinations were a tightly knit group with considerable security and discipline, the judge failed to distinguish between information available to the law enforcement officers before the

---

290-292 & n.4. We note that, despite words in the United States Senate Report to the effect that the Federal statute is aimed at organized crime, nothing in the statute itself so limits its application. We do not think, therefore, that a helpful parallel can be drawn between the intent of Congress in enacting the Federal wiretap statute and that of our own Legislature in defining "organized crime." The question we face here is what *specific words* in the statutory preamble constitute the legislative definition of organized crime. No indication exists, either in the words of the preamble or in the published legislative history of G. L. c. 272, § 99 (see sources at note 7, *infra*), that the Legislature intended to limit the statute's application to persons with the status of full-time professional criminals — or, in the precise words of the dissent, "to those notorious and readily recognized highly 'structured criminal syndicate[s] composed of professional criminals who primarily rely on unlawful activity as a way of life,'" *post* at 289. Such a limiting definition would insulate from electronic surveillance all criminal activity, no matter how organized, disciplined, and repeated, carried on by those who maintain legitimate jobs, perhaps in the public service, while at the same time committing the designated offenses set forth in G. L. c. 272, § 99 B 7. It can be argued, in terms of the value of privacy, that the dissent's narrow definition is good policy, but we are here construing legislative intent, not establishing our concept of the best policy.

decision to intercept was made, and information derived from the intercepted conversations. The only pre-surveillance evidence of organized crime referred to by the judge consists of McCue's testimony about his initial conversation with Thorpe, during which Thorpe said the examination was available to him "through an organization headed by a woman." We must determine whether this constitutes sufficient evidence of organized crime for purposes of the § 99 B 4 exception for law enforcement officers.

We observe first that, when the Commonwealth seeks to rely on a narrow exception to the broad statutory prohibition against warrantless surveillance, it is appropriate that the burden of establishing the exception's applicability should rest on the Commonwealth. Cf. *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974) (Commonwealth bears burden of showing reasonableness of warrantless search challenged as invalid under Fourth Amendment). We reject the defendant's contention that the Commonwealth should be required to demonstrate probable cause of the existence of organized crime. Probable cause is the applicable standard when a warrant is sought under G. L. c. 272, § 99 E. We do not believe the Legislature intended to require as stringent a showing in situations in which warrantless surveillance is authorized under § 99 B 4. Nor do we agree, however, with the Commonwealth's assertion that it need only show a good faith belief on the part of the law enforcement officials that organized crime was implicated. As evidenced by the statutory preamble and the legislative history, the Legislature proceeded on the premise that electronic surveillance is anathema except within certain narrowly prescribed boundaries. See G. L. c. 272, § 99 A (the "unrestricted use of modern electronic surveillance devices pose[s] grave dangers to the privacy of all citizens of the commonwealth"). When the Legislature decided, after proposals to the contrary, to allow some warrantless surveillance by law enforcement officers, it also decided, consistent with its concern for the privacy rights of individuals, to limit the reach of the statute to interception of offenses in connection with

organized crime.[7]  We do not think a subjective standard of good faith belief would give sufficient effect to this mandatory limitation.[8]    At the minimum, the Commonwealth

[7] In 1964 a special State commission was created to investigate electronic eavesdropping in Massachusetts.  The bill proposed by the commission required judicial authorization for *any* interception unless all parties to the communication consented.  Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, at 7, 18-19.  Law enforcement officers were required, without exception, to obtain warrants before conducting any surveillance.  This marked a significant departure from the "one-party consent exception" contained in the former State statute, St. 1959, c. 449, § 1, which exempted from the requirement of prior judicial authorization the interception of communications with the consent of either the sender or the receiver.  See *Commonwealth* v. *Douglas*, 354 Mass. 212, 221-222 (1968), cert. denied, 394 U.S. 960 (1969).  Petitions in the House and Senate, however, advocated retaining the one-party consent exception in all cases.  1968 House Doc. No. 3797. 1968 House Doc. No. 3665.  1968 Senate Doc. No. 355.  After considering these petitions, the House Committee on the Judiciary decided to include the one-party consent exception for law enforcement officers only, authorizing them to conduct warrantless electronic surveillance when they were party to the communication or had been given authority by one who was.  1968 House Doc. No. 4875.  This exception, as was most of the House bill, was enacted into law by St. 1968, c. 738, § 1.  See G. L. c. 272, § 99 B 4.

The greater power thus accorded police and other law enforcement officers is partially offset by the requirement, not present in the commission's proposal, that the statute be limited to investigation of "offenses in connection with organized crime as defined in the preamble." See G. L. c. 272, §§ 99 A, 99 B 7.

[8] The cases cited by the Commonwealth in support of a good faith standard do not involve wiretap statutes or any surreptitious activity on the part of the government.  See *Sussman* v. *New York State Organized Crime Task Force*, 39 N.Y.2d 227 (1976); *People* v. *Rallo*, 39 N.Y.2d 217 (1976).  *Sussman*, which is less inapposite than *Rallo*, concerned the interpretation of a New York statute giving the Attorney General's office authority to conduct hearings and subpoena witnesses in the course of investigating organized crime activities.  The New York Court of Appeals held that, if challenged, the Deputy Attorney General must make a preliminary showing in court that the purpose of his investigation is indeed inquiry into organized criminal activities, by establishing that he is acting in good faith and that the testimony he seeks bears a reasonable relationship to organized crime.  *Sussman, supra* at 232-233.  Thus, under the New York statute, the targets of the government's investigation may contest in advance the validity of subpoenas issued against them.  No such opportunity for advance judicial review is afforded the targets of the

should be required to show that the decision to intercept was made on the basis of a reasonable suspicion that interception would disclose or lead to evidence of a designated offense in connection with organized crime. The standard of reasonable suspicion is an objective one; it is met by a showing of articulable facts from which a reasonable person could conclude that interception would lead to evidence of a designated offense. Cf. *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968); *Commonwealth* v. *Silva*, 366 Mass. 402, 405-408 (1974).

Such a showing has been made here. The circumstances indicate that, on the basis of McCue's initial conversation with Thorpe on October 6, 1978, there existed a reasonable suspicion that interception of McCue's subsequent conversations with Thorpe would disclose evidence of a continuing conspiracy to unlawfully supply aspirants for promotion to sergeant with the requisite civil service examination. In reaching this conclusion, we rely not only on Thorpe's own statement that the examination was available to him through an organization headed by a woman (which statement itself, contrary to Thorpe's protestations, indicates he was not acting alone in offering to supply the examination), but also on one inescapable inference from that statement. Assuming as we do that upcoming sergeants' promotional examinations are strictly confidential and not readily available, we may infer that a certain amount of discipline and organization would be required to acquire and supply the examinations illicitly.

We thus conclude that the warrantless recording of the conversations between Thorpe and McCue falls within the G. L. c. 272, § 99 B 4, exception for law enforcement officers.[9]

---

Commonwealth's clandestine recording under the Massachusetts interception statute.

[9] Contrary to Thorpe's assertion, there is no requirement that "normal investigative procedures" be shown to have failed before the § 99 B 4 exception comes into play. Such a showing must be made only when a warrant is sought. C. 272, § 99 E 3 (requiring the applicant to demonstrate that

## 2. *Claimed Violation of Art. 14.*

Thorpe concedes on this appeal that the recording of his conversations with McCue's consent does not violate the Fourth Amendment to the United States Constitution. See *United States* v. *Caceres,* 440 U.S. 741, 749-751 (1979); *United States* v. *White,* 401 U.S. 745 (1971) (plurality opinion); *Lopez* v. *United States,* 373 U.S. 427 (1963). While abandoning his Federal constitutional argument, Thorpe argues that the warrantless interception violated his right to be free from unreasonable searches and seizures as guaranteed by art. 14 of the Massachusetts Declaration of Rights, because he had an expectation of privacy in not having his conversation with McCue recorded. For the reasons that follow, we find no constitutional violation.

The Federal constitutionality of warrantless electronic surveillance with the consent of one party to a conversation has been upheld on the ground that when one speaks one voluntarily assumes not only the risk that one's listener may repeat what one says to others, but also the risk that the listener may be recording or monitoring the conversation for broadcast to others. See *United States* v. *Caceres, supra*; *United States* v. *White, supra* at 751; *Lopez* v. *United States, supra* at 437-440; *Commonwealth* v. *Douglas,* 354 Mass. 212, 221-222 (1968), cert. denied, 394 U.S. 960 (1969) (involving challenge under Federal Constitution only).[10]

---

"normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried"). As the quoted language demonstrates, Thorpe is wrong in claiming that the State statute does not mention normal investigative proceedings except in the preamble. His preemption argument, which is based on the claimed failure of the State to comply in this respect with 18 U.S.C. § 2518 (1) (c) (1976), therefore fails.

[10] *United States* v. *Caceres,* 440 U.S. 741 (1979), and *Lopez* v. *United States,* 373 U.S. 427 (1963), each involved one or more recordings made by an Internal Revenue Service agent of a meeting with the defendant, during which the defendant tried to bribe the agent in order to secure favorable tax treatment. In *United States* v. *White,* 401 U.S. 745 (1971), government agents monitored the defendant's meetings with their informant, by way of a radio transmitter concealed on the informant. In *Commonwealth* v. *Douglas,* 354 Mass. 212 (1968), involving the predecessor to

Under this "assumption of the risk" analysis, no search or seizure covered by the Fourth Amendment is deemed to have occurred, and thus no warrant is required.

Envisioning serious intrusions on the right to privacy from the approval of electronic surveillance without prior judicial authorization, opponents of the "assumption of the risk" approach have rejected as unreasonable the premise that one necessarily accepts, or should be forced to accept, the risk of one's conversation being secretly monitored or recorded. See, e.g., *United States* v. *White, supra* at 786, 789 (Harlan, J., dissenting); *Lopez* v. *United States, supra* at 465-466 (Brennan, J., dissenting); Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 406-407 (1974); Comment, Electronic Eavesdropping and the Right to Privacy, 52 B.U.L. Rev. 831, 840-841 (1972). While bound by the United States Supreme Court's pronouncements on Fourth Amendment law, at least two State Supreme Courts have interpreted their State constitutional provisions against unreasonable searches and seizures to bar warrantless monitoring and recording without the consent of the speaker. *People* v. *Beavers,* 393 Mich. 554, cert. denied, 423 U.S. 878 (1975). *State* v. *Glass,* 583 P.2d 872 (Alas. 1978).[11] Relying largely on Fourth Amendment "expectation of privacy" principles derived from *Katz* v. *United States,* 389 U.S. 347 (1969), these courts have held constitutionally protected one's reasonable expectation that one's private conversation will not be electronically broadcasted or recorded absent consent or a warrant. *Beavers, supra* at 564-566; *Glass, supra* at 875. Cf. *State ex rel. Ar-*

---

c. 272, § 99, no government agent or informant participated in a conversation with the defendant, whose telephoned threats to a private individual were recorded by police officers with the individual's consent.

[11] In addition, the Supreme Court of Montana relied on that State's constitutional right of privacy to invalidate warrantless electronic monitoring and recording of conversations with the consent of one conversant, thus finding no need to consider separately the State constitutional provision against unreasonable searches and seizures. *State* v. *Brackman,* 178 Mont. 105 (1978).

*nold* v. *County Court,* 51 Wis. 2d 434, 439-440 (1971); *Hammond* v. *State,* 354 So. 2d 280, 292-293 (Ala. Crim. App. 1977), cert. denied, 439 U.S. 823 (1978); *Clariday* v. *State,* 552 S.W.2d 759, 769-770 (Tenn. Crim. App. 1976); *State* v. *Albo,* 584 P.2d 906, 908-912 (Utah 1978) (Maughan, J., dissenting) (agreeing with the analysis of *Beavers* and of the dissenting Supreme Court Justices in *United States* v. *White, supra* and *Lopez* v. *United States, supra*).

A primary justification for requiring the government to obtain judicial authorization before proceeding with any electronic surveillance is the possible chilling effect on First Amendment values if warrantless monitoring and recording were permitted. See, e.g., *People* v. *Beavers, supra* at 566; *State* v. *Glass, supra* at 877-878 & n.18; *Lopez* v. *United States, supra* at 452-453, 465-466 (Brennan, J., dissenting); *United States* v. *White, supra* at 787-789 (Harlan, J., dissenting); Greenawalt, The Consent Problem in Wiretapping & Eavesdropping: Surreptitious Monitoring with the Consent of a Participant in a Conversation, 68 Colum. L. Rev. 189, 216-221, 229-231 (1968); Stone, The Scope of the Fourth Amendment: Privacy and the Police Use of Spies, Secret Agents, and Informers, 1976 Am. B. Foundation Res. J. 1193, 1255-1257 (1976). The Supreme Court of Michigan in *Beavers, supra,* stressed that "[t]he warrant requirement is not a burdensome formality designed to protect those who would engage in illegal activity, but, rather, a procedure which guarantees a measure of privacy and personal security to *all* citizens. . . . Our laws must ensure that the ordinary, law-abiding citizen may continue to engage in private discourse, free to speak with the uninhibited spontaneity that is characteristic of our democratic society." The *Beavers* court was persuaded by Justice Harlan's dissent in *White,* which warned that "words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed" for the eyes and ears of other than one's intended audience. *United States* v. *White, supra* at 787 (Harlan,

J., dissenting). See *Katz* v. *United States,* 389 U.S. 347, 351-352 (1969); *Commonwealth* v. *Hall,* 366 Mass. 790, 794-795 (1975); *Commonwealth* v. *Dinnall,* 366 Mass. 165, 166-167 (1974); Stone, *supra* at 1207-1208 & n.49.

It has been emphasized that the relevant question is not whether criminals must bear the risk of warrantless surveillance, but whether it should be imposed on all members of society. *United States* v. *White, supra* at 786, 789-790 (Harlan, J., dissenting). *People* v. *Beavers, supra.* Amsterdam, *supra* at 384-385, 402-403. Comment, 52 B.U.L. Rev. at 843-844. In answering this question, we must assess the nature of the particular form of warrantless surveillance and its likely impact on the individuals' sense of security that is the concern of art. 14's protection against unreasonable searches and seizures.[12] In the case at bar we find no violation of the State Constitution. Here, a police officer, known to the speaker as a police officer and sought out by the speaker, recorded his conversation with the speaker. We do not think that free speech and privacy values are unduly threatened by the risk that when one speaks to a known police officer he may be recording the conversation. This is not the type of warrantless surveillance condemned by the courts and commentators discussed above, whose impact on privacy is "such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society." *United States* v. *White, supra* at 787 (Harlan, J., dissenting).

We realize that requiring a warrant for *every* electronic surveillance would have the virtues of clarity and predictability. Given the limited scope of the particular search at issue here, however, — a police officer, known to be such, recording his conversations with an individual — something less than the usual warrant requirement suffices to guard

---

[12] See *United States* v. *White,* 401 U.S. 745, 786 (1971) (Harlan, J., dissenting); Stone, The Scope of the Fourth Amendment: Privacy and the Use of Spies, Secret Agents, and Informers, 1976 Am. B. Foundation Res. J. 1195, 1219.

against arbitrary intrusions. Cf. *Terry* v. *Ohio*, 392 U.S. 1 (1968) (police officer entitled to conduct reasonable search for weapons when he has reasonable grounds to believe individual is armed and dangerous, even when no probable cause for arrest exists). In this context, sufficient protection is afforded by our statutory interpretation of c. 272, § 99 B 4, as requiring any interception by police officer to be based on a reasonable suspicion that interception will disclose or lead to evidence of a designated offense in connection with organized crime. Cf. Amsterdam, *supra* at 416-418, 422. As discussed in part 1 of this opinion, this standard has been met here.

Because on the facts of this case we find no violation of the State Constitution, we need not decide whether other forms of warrantless surveillance would violate art. 14. Nevertheless, it is apparent from the above reasoning of other jurisdictions that the better future course, and the most secure course constitutionally, is for law enforcement officials to procure warrants in cases where probable cause for surveillance can be shown, and even in cases where it does not appear that the statutes require a warrant.

3. *Conclusion.*

The denial of the motion to suppress is affirmed, and the case is remanded to the Superior Court for further proceedings.

*So ordered.*

LIACOS, J. (dissenting). The court in its opinion disregards the clearly expressed intent of the Legislature to limit electronic surveillance to certain designated offenses involving the activities of "organized crime." The court achieves this result by declaring the legislative definition of organized crime unworkable. This conclusion is without support in the record, and contrary to the clear legislative history of G. L. c. 272, § 99. I am comforted by the opinion in *Commonwealth* v. *Jarabek, post* 293 (1981), decided today, be-

cause it indicates, at least, some judicial restraint in rewriting G. L. c. 272, § 99. Nevertheless, the effect of the majority opinion in this case will be, I fear, to permit broad electronic surveillance in areas never intended by our Legislature in the enactment of G. L. c. 272, § 99. The consequence of the majority opinion will be to legitimize electronic intrusion on a broad range of individual activity solely on the basis of "reasonable suspicion" that organized activity by two or more persons may be involved.

It is significant to note that the language found in G. L. c. 272, § 99 B 7, which precludes electronic surveillance except in regard to designated offenses involving organized crime, is not constitutionally mandated. The inclusion of such limiting language involved a deliberate legislative judgment that this was the appropriate method of balancing the interests of law enforcement against the interest of protecting individual privacy rights.

The determination precisely at which point the respective needs for privacy of communication and for effective law enforcement must mutually yield with regard to authorization of electronic surveillance is a function peculiarly within the province of the Legislature. By refusing to give effect to statutory language defining the term "organized crime," the court today invades that province and usurps that function.

By 1967 the Congress of the United States recognized that scientific and technological developments had established the widespread use and abuse of electronic surveillance techniques as a serious threat to privacy of communication in all walks of life.[1] Sen. Rep. at 2154. Concluding that the status of wiretap and electronic surveillance law was intolerable and "serves neither the interests of privacy nor of law enforcement," Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 (1970), 82 Stat. 211 (1968). Sen. Rep. at 2154,

---

[1] See Senate Report on the Omnibus Crime Control and Safe Streets Act of 1968 (Judiciary Committee), Sen. Rep. No. 1097, 90th Cong., 2d Sess., [1968] U.S. Code Cong. & Ad. News 2112-2309 (hereinafter cited as Sen. Rep. with appropriate pagination to the U.S. Code Cong. & Ad. News).

quoting from Report of President's Commission on Law Enforcement and Administration of Justice. Title III serves the dual purpose of protecting the privacy of wire and oral communications, and delineating on a uniform basis, in conformity with the minimum constitutional standards as set forth in *Berger* v. *New York*, 388 U.S. 41 (1967), and *Katz* v. *United States*, 389 U.S. 347 (1967), the circumstances and conditions under which the interception of wire and oral communications may be authorized. Sen. Rep. at 2153, 2156, 2163. "To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers [investigating] . . . specified types of serious crimes, and only after authorization of a court order obtained after a showing . . . of probable cause." Sen. Rep. at 2153.

The Federal act is not self-executing in so far as State law enforcement authorities are concerned. In order to obtain a wiretap warrant from a State court, there must be a State wiretap statute in effect. *Commonwealth* v. *Vitello*, 367 Mass. 224, 247 (1975). Recognizing that the law enforcement needs of the different States vary, Congress left the States some latitude to individualize their wiretap statutes. While a State may not adopt standards for obtaining wiretap warrants that are less restrictive than those set forth in Title III, a State is free to adopt more stringent standards. *Id.* at 247.

Massachusetts has enacted a wiretap statute which in several significant respects is more restrictive than Title III.[2] See *Commonwealth* v. *Vitello, supra.* In enacting G. L. c. 272, § 99, "the Legislature proceeded on the premise that electronic surveillance is anathema except within certain narrowly prescribed boundaries." See the court's opinion, *supra* at 279. Thus, § 99 establishes a particularly "broad

---

[2] Many States have eschewed the use of electronic surveillance as a law enforcement technique. For listing of States which had not enacted an electronic surveillance statute or entirely prohibited such surveillance as of 1976, see Note, Electronic Surveillance — State Authorization of Wiretaps under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 56 B.U.L. Rev. 600, 601 n.14 (1976).

statutory prohibition against warrantless [electronic] sur-
veillance."[3] *Id.* "When the Legislature decided, after pro-
posals to the contrary, to allow some warrantless
surveillance by law enforcement officers, it also decided,
consistent with its concern for the privacy rights of individ-
uals, to limit the reach of the statute to interception of of-
fenses in connection with organized crime." *Id.* at 279-280.

Despite professing obeisance to these principles, the court
today so broadly defines organized crime, and so loosely ap-
plies that definition, as to substantially strip the statute of its
intended restrictive effect. Ignoring much of the statutory
language, the court defines organized crime as "'a continu-
ing conspiracy among highly organized and disciplined
groups to engage in supplying illegal goods and services.'"
*Id.* at 277. Nevertheless, the court finds the requisite con-
nection to organized crime in this case by inferring that a
"certain amount" of discipline and organization would be
required to acquire illicitly the examinations in issue. *Id.* at
281. Assuming such an inference is warranted, this quan-
tum of organization falls far short of that required by the
statute or even under the court formulation. One could as
easily infer that a "certain amount" of discipline and or-
ganization would be required to achieve the objective of any
conspiracy.

The highly descriptive language in the preamble of the
statute, as well as the common understanding of the term
"organized crime," suggest a much higher order of criminal
activity and organization than is revealed on the facts of this
case. The term "organized crime" refers to those notorious
and readily recognized highly "structured criminal syndi-
cate[s] composed of professional criminals who primarily re-
ly on unlawful activity as a way of life," *Masiello* v. *Norton,*

---

[3] Contrast, for example, 18 U.S.C. § 2511(2)(C) (permitting war-
rantless interceptions by law enforcement officers if such officer is party to
the communication or on the basis of consent of one of the parties to the
communication) with G. L. c. 272, §§ 99 B 4, 99 B 7 (permitting war-
rantless surveillance under similar circumstances only in the course of in-
vestigation of a designated offense in connection with organized crime).

364 F. Supp. 1133, 1135 (D. Conn. 1973), and not to criminal conspiracies, generally.

Like § 99, the "major purpose of [the law enforcement component of] title III is to combat organized crime." Sen. Rep. at 2157. The legislative history to Title III sets forth a lengthy description of organized crime which is in many respects strikingly similar to, but provides greater detail than, that set forth in the preamble to G. L. c. 272, § 99. The statutory definition of organized crime set forth in G. L. c. 272, § 99 A, provides: "The general court finds that organized crime exists within the commonwealth and that the increasing activities of organized crime constitute a grave danger to the public welfare and safety. Organized crime, as it exists in the commonwealth today, consists of a *continuing* conspiracy among *highly organized* and *disciplined* groups to engage in supplying illegal goods and services. In supplying these goods and services organized crime commits *unlawful acts* and *employs brutal and violent tactics*. Organized crime is *infiltrating legitimate business* activities and *depriving honest businessmen* of the right to make a living" (emphasis supplied).

The Legislature enacted this provision in full awareness of recent constitutional decisions and the legislative history of the Federal act (Title III). See Report of the Special Commission on Electronic Eavesdropping, 1968 Sen. Doc. No. 1132; Message of Governor John A. Volpe to the House and Senate, 1968 House Doc. No. 3797. Thus the enactment of G. L. c. 272, § 99, must be viewed in juxtaposition with the background of the enactment of the Federal statute. When the preamble is read in juxtaposition with this legislative history, which is excerpted at length in the margin,[4] it

---

[4] In setting forth excerpts from the legislative history of Title III, I emphasize, by italicizing, those portions of the description of organized crime which most closely parallel the language of the preamble: "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. . . . *The major purpose of title III is to combat*

becomes unmistakably clear that the Legislature did not intend its definition of organized crime to be so broad as the court suggests.

The court posits that effectuation of much of the descriptive language appearing in the preamble would render the statute unworkable. However, every word of a legislative enactment is to be given force and effect, if possible. Contrary to the court's contention, it would not be necessary under the statute to prove in every case that "a grave danger to the public welfare and safety" and that "brutal and violent tactics" are involved in the commission of each designated offense. Rather, it is only necessary to show some

_____

*organized crime.* . . . Ignored entirely in the development of our system of justice . . . was the possibility of the growth of a phenomenon such as modern organized crime with its attendant corruption or [*sic*] our political and law enforcement processes. We have always had forms of organized crime and corruption. But there has grown up in our society today *highly organized, structured and formalized groups of criminal cartels,* whose existence transcends the crime known yesterday, for which our criminal laws and procedures were primarily designed. . . . These hard-core groups have become more than just loose associations of criminals. They have developed into corporations of corruption, indeed, quasi-governments within our society, presenting a unique challenge to the administration of justice. . . . Today . . . [organized crime] is active in, and largely controls, professional gambling . . . [and] has an almost monopolistic control over the illegal importation, distribution and sale of narcotics . . . . Loan sharking, finally, is everywhere dominated by organized crime. . . . *Organized crime has not limited itself to criminal endeavors. It has large spheres of legitimate business and union activity undermining our basic economic mores and institutions.* . . . *Organized crime flourishes best only in a climate of corruption.* . . . Victims, complainants, or witnesses are unwilling to testify because of apathy, fear, or self-interest, and the top figures in the rackets *are protected by layers of insulation and* [*sic*] *direct participation in criminal acts.* Information received from paid informants is often unreliable, and a stern code of discipline inhibits the development of informants against organized criminals. In short, intercepting the communications of organized criminals is the only effective method of learning about their activities. . . . [U]nder 'present procedures too few witnesses have been produced to prove the link between criminal group members and the illicit activities that they sponser [*sic*]. Victims do not normally testify for they are already in bodily fear or they are compliant . . . . [T]he securing of an evidentiary substitute for live testimony, which is not subject to being eliminated or tampered with by fear or favor, is necessary." (Emphasis supplied.) Sen Rep. 2153-2161.

"connection" between the designated offense and those criminal groups designated in the preamble as organized crime. G. L. c. 272, § 99 B 7. The quantum of proof required to establish the organized crime connection is not so high as to render the statute unworkable. While the "wall of secrecy" surrounding organized crime renders it peculiarly difficult to gather evidence sufficient to obtain convictions of organized crime figures, G. L. c. 272, § 99 A, Sen. Rep. at 2159-2160, it is also common knowledge that organized crime connections are well-known to law enforcement agencies. Thus, a connection with organized crime may generally be susceptible of proof by "articulable facts" amounting to "reasonable suspicion." See the court's opinion, *supra* at 281.

In conclusion, I see no reason not to give full meaning to all the language of G. L. c. 272, § 99. Such an approach would fully effectuate the dual purposes of the statute of enabling law enforcement officers, upon a reasonable showing of a connection with organized crime, to more easily gather evidence through the use of electronic surveillance, while protecting "the privacy of all citizens of the commonwealth" from the "grave dangers" which would be attendant on the use of electronic surveillance as a general criminal investigative technique. G. L. c. 272, § 99 A. I dissent.